Argued April 9, reversed July 11, 1928.

F. J. LIPPOLD *v.* DR. ALLEN E. KIDD.

(269 Pac. 210.)

162

For appellant there was a brief over the name of *Mr. Omar C. Spencer,* with an oral argument by *Mr. F. S. Senn.*

For respondent there was a brief over the names of *Mr. Robert R. Rankin* and *Mr. W. A. Robbins,* with an oral argument by *Mr. Roy F. Shields.*

ROSSMAN, J.—█ Much of the testimony upon which the plaintiff predicated his charges of negligence was objected to by the defendant. The latter's particular objections were that this testimony was inadmissible to establish the charge that the defendant was guilty of negligence, and that the plaintiff's injuries were unaccompanied with a hypothesis showing the treatment afforded the plaintiff by the defendant. Previously the plaintiff had outlined in his testimony quite fully, the specific efforts which the defendant had made to determine whether any

object had invaded the eye. These services as described by the plaintiff, consisted of examination of the exterior of the eye, a painful examination of a scar on the white of the eye caused by the impact of the flying particle, and two or more examinations of the interior of the eye with a retinoscope. When the defendant's services were engaged, the left eyelid was injured, rent and swollen. This caused irritation of the surface of the eye; the plaintiff complained that he could see a blood clot and a foreign particle in the interior of his eye, and upon the surface of the eye, or in the rent of the eyelid, the defendant found a small foreign particle.

The plaintiff did not embody in his questions a description of the injured eye, plaintiff's complaint to the defendant, and the efforts which the defendant made to locate the object. He never submitted to his expert witnesses, Drs. Wetherbee and Babbitt, hypothetically the foregoing symptoms and course of treatment for the purpose of inquiring whether these services under those circumstances conformed to the standard established by eye specialists in the City of Portland and similar communities. In *Emerson* v. *Lumbermen's Hospital Assn.,* 100 Or. 472 (198 Pac. 231), Mr. Justice BEAN, speaking on behalf of the court, said:

"In a malpractice case the opinion of medical men may be received in evidence as to what would be the proper treatment, but in order for such expert witnesses to have a basis for their testimony they should be informed as to what treatment was given the patient, or what the physician in attendance had failed to do. * * * "

In *Lehman* v. *Knott,* 100 Or. 59 (196 Pac. 476), this court said:

"As an expert is not allowed to draw inferences or conclusions of fact from the evidence, his opinion should be exact upon a hypothetical statement of fact. It is the privilege of counsel to assume any state of facts which there is any testimony tending to prove, and to have the opinion of the expert based on the facts assumed. * * In a malpractice case the question whether a physician has in a given case adopted the proper treatment is one in which the opinions of medical men may be received in evidence, and they may state whether in their opinion the treatment was proper or not, whether it was in conformity with the rules * * "

Sound reason is the foundation for this requirement that the facts should be stated to the witness hypothetically. The expert witness is granted the privilege of expressing to the jury an opinion because his superior training enables him to arrive at a conclusion which is more likely to be sound than that of the average juror. But all opinions are based upon facts; generally the recipient of an opinion is at a loss to know what use he may advisedly make of an expert's opinion unless he also knows what facts the expert took for granted when he formulated his conclusion. And it is equally necessary to the expert that before he is required to express an opinion he should be supplied with the necessary data. We see this exemplified in the daily affairs of life: a building contractor cannot safely submit a bid without detailed plans and specifications, and his bid is worthless to an owner unless plans and specifications give the owner a detailed impression of the contemplated structure. The hypothetical question serves to the court and the jury the purpose of the plans and specifications. Upon the other hand, Drs. Wetherbee and Babbitt testified concerning the use of the ophthalmoscope and X-ray as means employed by eye special-

ists, without having been first acquainted with the symptoms apparent when the plaintiff came to the defendant. We do not believe that their answers are capable of an interpretation that in all eye injury cases these instrumentalities are used. If not, then, we are concerned only with the case which the plaintiff brought to the defendant January 31st.

But Drs. Wetherbee and Babbitt described to the jury the condition of the eye as it was when they first saw it August 30, 1924, seven months after the plaintiff had discontinued the defendant's services. In the meantime the pain in the eye had first subsided and later became excruciating; the vision of the eye had materially lessened, the rent in the eyelid had become healed, the interior of the eyeball had become highly inflamed, and the scar on the surface of the white of the eye had closed. The lower court permitted Drs. Wetherbee and Babbitt to outline fully the efforts which they expended to locate the foreign object. The care, knowledge and skill of these specialists, commendable as it is, is not the yardstick by which the defendant's case is to be determined. Further it will be observed that the circumstances had materially changed. The passage of seven months' time first brought a diminution of the pain and then a marked increase of it, accompanied by a lessening of vision. This perhaps would be sufficient in itself to convince a physician that the surface scar could not be the cause of the condition from which the patient was suffering. Also when the plaintiff came to these physicians, there was no blood clot within the eye that might have been the cause of the pains within, nor was there a swelling in the eyelid to irritate the surface of the eye; likewise there was no foreign particle on the eye which might have mis-

led the physician into the belief that it was the object which had caused the injury. August 30th the scar upon the white of the eye which must have given the plaintiff some pain had healed.

■ In order to sustain the questions, counsel for the plaintiff relies upon the rule that when an expert possesses knowledge, which he gained from personal observation, he may employ it as the premise for a conclusion, and impart the latter to the tribunal in response to the ordinary type of a question, and that a hypothetical question is necessary only where the expert is asked to give his opinion upon facts which he has not gained by the process of personal observation. It is true, that if the expert testifies to a conclusion based upon a premise with which he has become familiar through personal observation, the question which elicits from him the conclusion need not be a hypothetical one. In such an instance he supplies both premise and conclusion. But where he is unfamiliar with the premise and is asked to express a conclusion, a premise must be stated to him in a hypothetical form: Wigmore on Ev. (2 ed.), § 676; Jones, Com. on Ev. (2 ed.), §§ 1325 and 1333. The material fact in this case was, what attention ordinary care would have bestowed upon the eye as the facts appeared to an eye specialist on January 31st. In lieu of that the witnesses apparently responded in regard to the situation as of August 30th when the plaintiff called upon Drs. Wetherbee and Babbitt. If Drs. Wetherbee and Babbitt supplied both premise and conclusion, their answers were insufficient to establish negligence because the only premise with which they were familiar was that of August 30th. If they undertook to base their conclusions upon the facts of January 31st, the

question should have supplied the premise in hypothetical form. Moreover, the premise itself was in dispute. Thus the plaintiff and defendant did not agree as to whether a retinoscope or ophthalmoscope was used; they did not agree as to what took place upon the occasion of the second treatment. Be this as it may, neither Dr. Wetherbee nor Dr. Babbitt testified that under the circumstances as they appeared to the defendant January 31st, his treatment fell short of the established standard. Drs. Wetherbee and Babbitt clearly and in a very understandable manner described their services and the manner in which they discovered the presence of the foreign substance. They also added that the appliances which they employed and the knowledge they possessed were of the type ordinarily employed—"or should be." But this fails to establish that several uses of the retinoscope, January 31st and the succeeding dates, and the defendant's other efforts failed to constitute due care.

In their further endeavors to sustain the questions put to the plaintiff's expert witnesses the plaintiff argues:

"The testimony of Dr. Wetherbee shows, that his opinion was based on his personal knowledge, gained from the history of the case, his treatment of respondent, and his personal observation of conditions which he found to exist with reference to respondent's left eye during the time of his treatment, at the time he operated on the Respondent, and from the dissecting of the eye subsequent to the operation, which facts had already been fully explained to the jury by Dr. Wetherbee and by respondent. In such a case it is not necessary, and the law does not require that Dr. Wetherbee's testimony, which he has already detailed to the jury, and respondent's testimony, which showed the treatment he received from Dr.

Kidd, should be repeated in hypothetical form, before he would be permitted' as an expert, to base his opinion on conditions which he found to exist by personal knowledge and observation.''

It thus appears that the expert witnesses based their conclusions upon their personal knowledge, their treatment of the plaintiff, the operation on the eye, what they observed as it was dissected and the testimony which they heard in the courtroom. If in fact the expert witnesses based their conclusion upon the foregoing data, their answers were inadmissible for several reasons. For instance the testimony was in conflict, as we have stated before. This would clearly demand that the facts should be supplied to the expert hypothetically. The rule was thus stated by Mr. Justice CHRISTIANCY of the Michigan court some years ago in *Kempsey* v. *McGinniss,* 21 Mich. 123:

''But as the jury are to pass upon the credibility of all witnesses and the weight of the evidence, and to determine all matters of fact involved in the case, no witness can have the right to usurp the power of the jury, or to determine any of these questions for them, nor even to give an opinion upon the weight or credibility of any of the testimony. No question, therefore, can be put to the witness which calls upon or allows him to decide upon the truth or falsehood of any evidence in the case. If, therefore, there be any conflict between the witnesses as to the facts upon which a professional opinion is sought, it is manifest the professional witness cannot, though he has heard the testimony, be asked to base his opinion upon that testimony, upon the hypothesis of its truth; because, to reach his conclusion, he must necessarily pass upon the credibility of the witnesses and the weight of the evidence. In the case of any such conflict, therefore, the only proper mode of interrogating the professional witness, is by stating and enumerating in the question itself, the facts to be assumed. And when

his opinion is asked upon a case (such as the physical or mental effects of a disease upon a certain person, under certain circumstances and exhibiting certain symptoms), as stated by other witnesses, when there is no conflict, he is to assume, without undertaking to decide, the truth of their statements, and to base his opinion only upon the facts thus assumed, leaving the jury to determine whether such assumed facts are true or false.''

We conclude that the evidence of defendant's negligence was inadmissible. This case is one of importance to the plaintiff: the loss of an eye is no trivial matter. The plaintiff has received $1,000 insurance money which is fortunate. Due to the importance of the case to both the plaintiff and defendant, we feel justified in considering the assignment of errors based upon the denial of the motions for a nonsuit and directed verdict.

■ Addressing ourselves now to the assignments of error based upon the motions for a nonsuit and a directed verdict and conceding as admissible all of plaintiff's evidence, we find that Dr. J. R. Wetherbee testified that the ordinary practice of physicians engaged in his specialized branch, is to make an examination of the exterior surface of the eye: this is followed by an examination of the interior of the eye by the use of an appliance called the ophthalmoscope, and finally the eye is photographed with an X-ray machine. The evidence established that the defendant had no X-ray photographs made of the plaintiff's eye. The plaintiff's testimony was to the effect that the defendant failed to make an examination of the interior of his eye with the ophthalmoscope. The foregoing established *prima facie* case of negligence, but negligence alone is not sufficient. The plaintiff is required to go further and establish by a preponderance

of the evidence that such negligence was the proximate cause of the injury for which he seeks redress in damages and prove all items of injury. And this court has on previous occasions enunciated the rule that when an alleged injury may have been due to one of several causes, any one of which may have been the sole proximate cause, there can be no recovery unless it is shown that as between the two or more causes in question, it was the negligence of the defendant which caused the injury: *Merrian* v. *Hamilton,* 64 Or. 476 (130 Pac. 406); *Engstrom* v. *Wise Dental Co.,* 97 Or. 634 (193 Pac. 187); *Spain* v. *O. W. R. & N. Co.,* 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104). The plaintiff rested his case in chief without supplying any testimony as to the effect upon the eye produced by the presence of a foreign particle in its interior; likewise, at this stage of the case there was no evidence before the court as to the effect upon the eye caused by the entry into it of a foreign particle and its progress to its final place of repose in the posterior portion of the eye. The evidence showed without dispute that the small particle of steel became embedded in the posterior part of the eye in contact with the retina. The defendant called as a witness Dr. H. C. Fenton, an eye specialist of thirty years' practice in Portland, who testified that when any foreign particle becomes impacted in the retina, sooner or later the retina becomes detached and the victim loses the sight of his eye, and that a piece of steel which penetrates the eyeball with sufficient force to embed itself in the posterior part of the eye, eventually causes a shrunken eyeball and necessitates its removal. Continuing, he testified that this piece of steel, lodged where it was, would have produced a permanent loss

of sight whether it had been removed promptly or not. His testimony was that the eventual loss of his eye would occur whether the foreign substance was promptly removed or not.

"Q. And is it material whether the body is removed immediately or later on? A. Not a foreign body that penetrates the eyeball completely, when it lodges in the posterior sclera, or retinal region, that doesn't materially change the pathology of the eye, whether you remove it then or later. It has done its work going through; it has done its damage. * * Q. Have you not also removed, or have there not been cases where foreign bodies have been removed from the retina and the eyesight still preserved? A. No, sir. Q. None at all? A. No foreign bodies can be impacted in the retina and removed and leave a perfect eyesight; you will have a chronic inflammation and loss of sight gradually, with detached retina. Q. Is this foreign body impacted in the retina? A. In the retina. Q. That is what Dr. Wetherbee testified to. A. It shows that in the picture. Q. You say there could be no removal of that foreign body which would save the eyesight? A. No, sir."

Dr. Wetherbee testified:

"Q. I want to ask you Doctor in furtherance of your testimony this morning that you have taken care of Mr. Lippold and treated his eye, whether or not it would have made any difference in that eye if the particle had been left in? A. Yes, it would have, and it was making a difference, was the reason he came to have it examined further. Q. Can foreign particles such as this be removed from the eye and the sight retained, Doctor? A. They have been. Q. Dr. Wetherbee, Dr. Fenton testified in answer to some direct, as well as cross questions, touching this eye, and said, 'You will have a chronic inflammation and loss of sight gradually, with detached retina;' is that true? A. Not necessarily. A small piece of detached retina, if not in the direct line of vision,

would not necessarily destroy the vision. Many people have portions of retina detached for many years without affecting their direct vision, central vision. Q. State whether or not that would be true of this eye, with the amount of detached retina that is there exhibited? A. Impossible to state. Q. If the particle had been promptly removed Doctor, would you have a chronic inflammation and loss of eyesight, gradually increased? A. You might and might not; nature is an unknown quantity."

The foregoing testimony of Drs. Fenton and Wetherbee constitutes the only evidence which we have as to the effect of the entry into and deposit within the eye of a foreign substance. The preceding is not the only uncertainty that is presented by the evidence. The plaintiff contended that the defendant should have drawn the particle of steel from the eye by the use of a magnet. This is the sole means disclosed by the testimony employed by eye specialists for the removal of metallic substances from the eye. However, it appears from the evidence that a magnet is not always successful in withdrawing these foreign particles. When Dr. Wetherbee was asked whether a magnet would have withdrawn this particle from the eye, had it been promptly applied, he replied: "It might or might not have been removed * * One can never give a positive answer about anything in connection with the action of electricity or adhesion. The experience of ourselves and others is in many cases these foreign bodies can be removed, but they cannot always be removed." Dr. Wetherbee applied a magnet of great power to this particle shortly after he discovered its presence in plaintiff's eyeball, but the application was unsuccessful. This was seven months after the accident. He explained the failure of his magnet to

withdraw the object by saying, that nature throws an inflammatory exudate about the invading substance and as time goes on this becomes hardened into fibrous tissue and thus the foreign particle becomes more or less anchored in the eye. Two other eye specialists also applied magnets after the defendant's services had been terminated, but neither succeeded in withdrawing the foreign object.

Thus the record presents us with four uncertainties: first, the journey of the particle of steel through the ball of the eye and into the posterior region may have caused the condition for which the plaintiff seeks to hold the defendant accountable; second, the foreign particle taking its position in contact with the retina eventually may have caused the latter to become detached from the rest of the eye and the vision thereby would have become destroyed; third, had the defendant discovered the foreign object and applied a magnet promptly to its removal his efforts might have failed, and fourth, the defendant's alleged negligence in failing to locate the particle and remove it may have been the cause of the eventual loss of the eye.

■ Before the plaintiff could recover for injury to his eye, it was necessary that he should be possessed of an eye that a physician's skill could rehabilitate. If his eye was already damaged beyond repair, he suffered no ill effects from the defendant's negligence. His proof was that before the accident both of his eyes had good vision; then came an injury, the inevitable effect of which, according to Dr. Fenton, was to destroy ultimately the vision of the left eye. This was met by the testimony of Drs. Wetherbee and Babbitt that this result was not inevitable, but that it sometimes occurred. However, they gave to

the jury no formula whatever by which it could determine whether the injury to the eye would eventually destroy its usefulness. So far as the record discloses, no one except Dr. Fenton knew whether the plaintiff's eye, when he engaged the defendant's services, would respond to treatment, or whether the entry of the invader had set in motion; forces that seven months later would necessitate the eye's removal. Dr. Fenton testified that an eye thus injured later developes serious inflammation and that when this condition presents itself the eye must be removed to prevent the spread of the inflammation to the other eye. When the plaintiff called upon Dr. Wetherbee, the eye was in fact seriously inflamed. Leaving this subject of inquiry temporarily, the evidence discloses that what the plaintiff claims the defendant negligently omitted to do would not necessarily have been beneficial. That is, the magnet may and may not have removed the object. Here again the medical men gave the jury no axiom which could be applied in an endeavor to determine whether an application of the magnet to the plaintiff's eye promptly would have been successful. In fact they said that they themselves did not know. The law does not demand of a plaintiff that he establish with certainty the proximate cause of his injury. If the proof shows that a certain factor probably bore to injury the relationship of cause, the law is satisfied and denominates it the proximate cause. See the probable or the natural consequences as the test of liability in negligence, 40 Am. Law Register, 79. We thus have two uncertainties: that concerning the magnet, and the uncertainty about the condition of plaintiff's eye when he engaged the defendant's

services. In *Elliff* v. *Oregon R. & N. Co.*, 53 Or. 66 (99 Pac. 76), this court said:

"Whether or not the injury to the plaintiff would have happened, but for the negligence of the defendant in failing to warn him, is problematical, and in cases of doubt as to which of several probable causes produced a hurt, the case should be submitted to the jury for their determination of the question."

In *Buchanan* v. *Lewis A. Hicks Co.*, 66 Or. 503 (133 Pac. 780, 134 Pac. 1191), we said:

"Where, however, a question as to which of the several causes produced the injury arises, the issue should be submitted to the jury for their determination."

■ In both of those cases no scientific knowledge was required to enable the juror to choose among causes and determine which one was responsible for the consequence. In *Merrian* v. *Hamilton, supra, Engstrom* v. *Wise Dental Co., supra,* and *Spain* v. *O. W. R. & N. Co., supra,* this court insisted that there rested upon the plaintiff a burden of proving by a preponderance of the evidence that the negligent cause for which the defendant was responsible was the factor which brought to the plaintiff his injury. In each of those cases there was more than one possible cause, and a knowledge of scientific matters was apparently necessary in making the choice. So, also, with our present case, a knowledge of the eye and its fine constituent parts is necessary to know whether the plaintiff's eye after the accident was capable of rehabilitation through the exercise of an eye specialist's due care. Such evidence, however, was totally lacking. See especially the decision written by Mr. Justice (now Chief Justice) TAFT in *Ewing* v. *Goode*, 78 Fed. 442; also, *Koch* v. *Zimer-*

*man,* 85 App. Div. 370 (83 N. Y. Supp. 339). Such being the condition of the record we fail to understand how the judgment of the lower court can be upheld. We are not justified in endeavoring to weigh the testimony. Where there is competent evidence upon any subject the jury's favorable consideration of it binds us. Our determination of the foregoing matters is that there was no evidence that when the plaintiff came to the defendant, his left eye was capable of rehabilitation. These conclusions find support in the authorities: *Becker* v. *Janiski,* 15 N. Y. Supp. 675; *Bush* v. *Chilcott,* 64 Mont. 346 (215 Pac. 1001); *Kosak* v. *Boyce,* 185 Wis. 513 (201 N. W. 757). The facts of this latter case bear a striking resemblance to those before us. The defendant physician failed to locate the particle of steel in the plaintiff's eye; another physician later located and removed it with a magnet; still later it was found necessary to remove the lens because a cataract formed over the wound on the eye. But, since the evidence failed to prove that the defendant's negligence was the proximate cause of the removal of the lens, the court held the defendant was not liable for this result. It allowed the plaintiff damages, however, for pain and suffering caused by the particle of steel in the eye.

■ We have no desire whatever to construct a snug harbor constituting a haven of refuge for the medical practitioner who negligently discharges a duty which he owes to his patient; but we believe that in those instances in which a plaintiff should recover, he ought to have no serious difficulty in supplying the necessary proof of proximate cause. As we have said before, certainty is not required; probability will suffice. In our present case, if the defendant is not

in fact responsible for the unfortunate result, it would be equally unfortunate to hold him to account. Difficulty in establishing a fact should not prompt a court to dispense with proof and impose a liability upon one who did not inflict the injury.

It follows from the foregoing that the judgment of the lower court must be reversed, and that the court erred in denying the motion for a nonsuit and also for a directed verdict. It is instructed to enter a judgment for the defendant.          REVERSED.

RAND, C. J., and COSHOW and BEAN, JJ., concur.