Argued September 21, 1934; affirmed January 15, 1935

HEIDER *v.* BARENDRICK ET AL.

(39 P. (2d) 957)

*Frank S. Senn,* of Portland (Senn & Recken, of Portland, and James E. Burdett, of McMinnville, on the brief), for appellants.

*Walter L. Tooze,* of Portland (Otto W. Heider, of Sheridan, on the brief), for respondent.

ROSSMAN, J.  The complaint alleges that August 9, 1932, the plaintiff engaged the services of the defendants to remove a cyst from the right side of his neck; that August 11, 1932, they performed the operation; and that "the defendants, through their failure and neglect to exercise due and proper skill and care, carelessly and negligently cut into, injured and bruised the right spinal accessory nerves and other nerves feeding the sternomastoid, trapezius, and levator scapulae muscles on the right side, thereby, and by reason of said carelessness and negligence, directly and proximately causing a paralysis and atrophy of the right sternomastoid, trapezius and levator scapulae muscles of the plaintiff".  The answer admits that the defendants are physicians and surgeons; that they are engaged in the practice of their profession as partners; that on August 9, 1932, the plaintiff sought their services for the treatment of a cyst, and that they removed

the cyst. All other averments of the complaint are denied.

The following is a review of the portions of the evidence necessary to a disposition of the assignments of error.

For several months prior to August 9, 1932, the plaintiff, who was 39 years of age and in good health, had noticed a lump on the right side of his neck. On that day he consulted the defendants and was informed that the cause of the lump was a cyst which should be removed. Shortly prior to this consultation the plaintiff had suffered from an attack of tonsilitis, and the defendant, E. H. Barendrick, advised him upon the above-mentioned occasion that the tonsils and cyst could be removed at the same time. He also assured him that he would fully recover from the operation in not to exceed ten days' time. Thereupon the parties agreed that the operation should be performed on August 11. On that day, after the tonsils had been removed, Dr. E. H. Barendrick, to whom we shall hereafter refer as the defendant, applied a local anaesthetic and then made an incision about two and one-half inches long and two inches deep in the part of the plaintiff's neck in front of the right spinal accessory nerve, for the purpose of removing the cyst. He described the cyst as "about the size of a small egg" and branchial in character. According to his testimony, he employed "blunt dissection", gradually working away all the tissues surrounding the cyst until it was completely exposed. He then cut the pedicle which attached the cyst to the esophagus, removed the cyst and closed the incision. The wound healed promptly. The defendant testified that in performing this operation he experienced "a good deal of difficulty, this tissue did not separate from the growth as easily as I would have liked", and added that about three-fourths of an hour was required for the opera-

tion. The plaintiff testified that in the course of the operation, "I felt quite a sharp pain in my neck, and he said to the nurse, he says, 'I got a little too deep then', and he asked me if it hurt me, and I told him it did, and just after that I got awful sick, sick at my stomach * * *". He swore that immediately following the operation he noticed that the right side of his face was numb, and that shortly thereafter he experienced pains, aches and discomforts in his right arm and shoulder. According to his testimony, he could no longer raise his right arm above his head. On the day of the trial the defendant examined the plaintiff and, upon being asked whether his right shoulder was any lower than his left, and if so, how much, replied, "I would say probably two inches". After these untoward effects had begun to manifest themselves, the plaintiff returned repeatedly to the defendant's office for advice and treatment. At first he was advised that the ill effects of the local anaesthetic had not yet spent themselves, and next that the spinal accessory nerve, which is about twelve or fourteen inches long, had become temporarily involved with the scar tissue. In the early part of November, 1932, when the plaintiff's condition had not improved, the defendant suggested that a specialist be consulted, and on November 14, 1932, plaintiff and defendant consulted Dr. R. B. Dillihunt of Portland. After Dr. Dillihunt had made an examination, he recommended that Dr. A. H. Dixon, a nerve specialist, be consulted. This was done, and, pursuant to Dr. Dixon's suggestion, the plaintiff submitted to a further examination by Dr. Lawrence Selling. Still later, the plaintiff returned to Dr. Dillihunt three times and to Dr. Dixon once. According to the defendant, Dr. Dillihunt "didn't think that the nerve was doing its function; in other words, the impulse wasn't being carried or transmitted to the muscle; consequently during that time he wanted

the arm kept in a sling so it would not stretch out and pull down the muscle, and as soon as the nerve function would come back then he wanted to institute a system of regular exercise so as to redevelop the strength in that shoulder''. Following Dr. Dillihunt's suggestion, the defendant prepared a sling and the plaintiff wore his arm in it. December 15, 1932, the defendant signed a certificate, addressed to a life insurance company from which the plaintiff was entitled to the payment of disability benefits, wherein defendant declared that one month after the operation ''a definite atrophy and weakness of trapezius levator scapulae and sternomastoid muscles was noted and has been progressive. Dr. R. B. Dillihunt, orthopedist, in Medical Dental Building, and Dr. A. H. Dixon, neurologist, same location, Portland, have been in consultation. Diagnosis is injury of spinal accessory nerve, probably both traumatic and cicatricial contracture. Some nerve function is being transmitted, i. e., paralysis is not complete, tho not more than 25 per cent function. Because of pain with function or use of the right shoulder girdle and weakness, patient is disabled from doing any farm labor and is only able to supervise hired labor''.

Dr. V. C. Staats, defendant's witness, who examined the plaintiff April 14, 1933, and June 12, 1933, signed a certificate upon the latter day in which he declared that at both times ''the right shoulder was about 1½ inches lower than the left, that the scapula on the right side was pulled away an unusual distance from the spine, that there was some trouble or inconvenience in raising the right arm. Subjectively, he complained of pain, that was increased after work, inability to stand up straight, and nervousness. I believe the trouble to be due to an impairment of the branch of the spinal accessory nerve that supplies the trapezius muscle. As the muscle is responsible directly for the objective symptoms, I be-

lieve that more time should elapse and he should engage in active work to determine if the nerve injury will undergo repair. I suggest a waiting period of six months". Dr. Staats admitted that when he first saw the plaintiff (April 14, 1933) "we advised him to work" and that he did so, but that upon the subsequent visits his condition had not improved.

· December 3, 1932, the plaintiff consulted Dr. John Manning. The latter testified that after the plaintiff had placed himself in his care, "I advised that we try rest for a while, giving the arm a rest, keeping it in a sling, and then we tried exercising the arm * * *. We have done some treatments at the office and we have tried various degrees of exercise from hard manual labor to moderate degrees of massage and rubbing and manipulation". Further, he testified that at various times he tested the muscles of plaintiff's right arm and shoulder and reported the results thus: "From the physical examination of the muscle and from the electrical test that I did I can't see that there is any improvement." The last test and examination by this physician was made the day before the trial. All agreed that the electrical machine which Dr. Manning used for the purpose of testing the shoulder muscles was an approved method which accurately indicated the conditions. The plaintiff, his wife, and his neighbors testified that for a substantial period of time the plaintiff resumed his work upon his farm. Dr. Manning swore that after the plaintiff had worked for a month or so "the muscles were, if any different, more atrophied, more hollowed out at the time, and, in my opinion, the shoulder was a little lower than it was before that work started".

The defendant was positive that the tonsil operation was not responsible for the plaintiff's present con-

dition, and swore that the cyst incision healed promptly without infection. While in the period immediately following the operation he believed that a scar tissue involvement might explain plaintiff's unsatisfactory condition, he swore that scar tissue disappears in four, five or six months, and that, since a much longer period of time than that had elapsed, scar tissues could not be responsible for the result. In fact, after all possible causes of plaintiff's present condition were reviewed with the defendant upon the witness stand, he swore he knew of no explanation of the condition except "a nerve involvement". While he found that plaintiff's right shoulder was two inches lower than his left, he believed that plaintiffs condition was improving and that regular use of the arm and shoulder would soon restore those members to their normal condition. He explained: "He may need some help to get the muscle started, in the way of heat or light treatments and things of that sort, but I am absolutely convinced that with proper treatment those muscles can be brought back." He conceded, however, that if the nerve has been severed the injury is permanent, and that such treatments would be wholly ineffective.

According to the defendant, the spinal accessory nerve supplies the trapezius muscle, which is fanshaped and extends "over the back of the head down to the spine over the shoulder blade and around the front to the outside third of the collar bone". Continuing, he said that if the spinal accessory nerve, which is "about the size of a piece of twine", were cut "the muscle (trapezius) would relax and allow the shoulder to droop away from the body". He added that this muscle would thereupon atrophy and could never be restored "unless that nerve could later be picked up and sewed together again". He explained his reason for taking the plaintiff to Dr. Dillihunt thus: "I took him to Dr.

Dillihunt because I was concerned with his condition, what it ultimately might be * * * I was concerned whether there was a permanent injury to the nerve; in other words, I wondered if I had cut it * * * as I say, my purpose was to determine whether there had been any permanent injury to the nerve."

According to the defendant, he used, in the performance of this operation, the skill, care and caution ordinarily employed by physicians and surgeons. His counsel asked him: "Now, doctor, I will ask you to state whether you did, while you were performing that operation, in any way cut or injure the spinal accessory nerves or any other nerves that supply the sternomastoid, trapezius or levator or any of those muscles?" He replied: "I did not cut those nerves", and was then asked: "How do you know that?" to which he answered: "Because the muscle would completely have withered if those nerves had been cut, and it has not done so." He explained: "In handling these tissues it is impossible, the necessity of cutting that tumor out, it is impossible to work with tissues without handling nerves and any handling of nerves is going to result in some temporary damage, and that damage will be recovered from if the nerve is not cut." He testified that if the spinal accessory nerve were bruised or cut into, but not severed, it would "regrow". He believed that six months would be ample time for the regrowth of a bruised nerve, but that three or six months more would be required to redevelop the muscle if it had atrophied in the meantime. He testified that cutting the spinal accessory nerve would not be a proper act, but declared "it could happen as an accident and we would consider it as an accident. * * * I would not testify it was negligence or incompetency. * * * In the ordinary course of events, in such an operation in similar communities with men comparable to ourselves,

it might occasionally happen, but it would happen as an accident if it does''. In another part of his testimony he stated: ''I don't think one would do it in an accidental way. You would have to be intending to cut part of it.'' In answer to the question: ''In performing this operation you did not have any accident such as you spoke of?'' he replied: ''I don't think I did.''

Dr. Manning testified that the plaintiff's right spinal accessory nerve ''certainly isn't functioning'' now, and swore: ''I am of the opinion that the nerve will never regain its function. * * * Due to the conditions I find the muscle in at the present time, after all this period of time has elapsed, in my opinion, the nerve is severed.'' In response to a hypothetical question which narrated the incidents of the operation, this witness replied: ''We would naturally assume it (the spinal accessory nerve) was cut at the time of the operation.'' He also declared: ''It is never proper treatment to sever any main nerve excepting for the relief of pain and in an emergency.'' He added: ''It would be improper'' to sever this nerve in the removal of plaintiff's cyst. According to the testimony of Dr. Manning, ''the third and fourth cervical nerves send branches to the lower part'' of the trapezius muscle and this accounts for the fact that the trapezius muscle has not become wholly atrophied.

Dr. Dillihunt, as a witness for the defendant, testified that November 14, 1932, when he examined the plaintiff he found that ''one of the muscles was very, very extensively weakened'', but while examining the plaintiff before the jury, declared: ''As far as I can see, the muscle back there has entirely recovered over when I first saw you.'' He expressed the belief that there now exists no present injury ''because the muscle is there, the atrophy has disappeared; he lets his shoulder hang out here, but it can be readily restored in position

with the other side. I don't think there is any disability. I know the nerve has not been cut and I think there is no disability". Dr. Selling testified: "There was no possibility of the spinal accessory nerve having been severed, the electrical response I obtained absolutely excludes a possibility of that nerve being severed." His electrical machine was apparently of the same type as Dr. Manning's. Both Dr. Dillihunt and Dr. Selling conceded that the nerve may have been injured in the course of the operation. In fact, Dr. Dillihunt expressed the belief that the growth of the cyst possibly pushed the spinal accessory nerve out of its natural position, and he left an intimation that when the defendant encountered it in its unexpected position he bruised it, thereby putting it to sleep. We shall not review the testimony of the other witnesses. It is not different in character from the above.

The first assignment of error is based upon rulings of the circuit court made during the direct examination by the plaintiff, of the defendant and of Dr. Manning. The first of these questions inquired of the defendant: "And cutting the spinal accessory nerve, doctor, what could you say as to whether or not that would be a proper thing in connection with an operation of that character?" The witness had previously testified that he was the surgeon who had performed the operation and had described plaintiff's condition as well as the course of the operation. One of the questions submitted to Dr. Manning, and attacked in this assignment of error, is: "And now, let me ask you this question, state whether or not a bruised nerve would cause that condition that you know of your own personal knowledge, that is, one that was bruised at the time he came to you?" Before this question was asked the witness had given his above-mentioned testimony. Another of the questions submitted to Dr. Manning was: "What,

in your opinion, doctor, is the condition of that spinal accessory nerve, based upon your own knowledge and your examination?'' The defendant interposed objections to these questions and seeks to sustain them with .the contention: ''Expert testimony by physicians and surgeons may be given in only one way, and that is by hypothetical questions.''

In *Lippold v. Kidd,* 126 Or. 160 (269 P. 210, 59 A. L. R. 875), we pointed out that when the expert is requested to express an opinion upon facts observed by himself and has already related them to the jury, the question need not be a hypothetical one. Eleven Ruling Case Law, Expert and Opinion Evidence, §§ 9 and 10, well state the circumstances requiring the use of a hypothetical question. We quote:

''When an expert has no personal knowledge of the facts, but is called to prove the scientific conclusion deducible from the facts proved by other witnesses, the exact state of facts on which he is to express an opinion is presented to him by a hypothetical question. But when his testimony is not given in response to such a question, he must first be shown to have a personal knowledge of the facts sufficient to enable him to form an opinion entitled to weight with the jury. * * . * When the expert has no personal knowledge of the facts but is called to state the conclusion which should be drawn, according to his knowledge and experience, from the facts to which other witnesses have testified, a series of somewhat difficult questions arise * * *. The solution of this problem which has been worked out by the courts is to permit counsel to put to the expert, after his competency has been established, a question in which the things that counsel claims to have proved are stated as a hypothesis. * * *''

Before the defendant was asked whether it would have been proper for him to cut the plaintiff's spinal accessory nerve he had testified that he was the surgeon in charge of the operation, described plaintiff's condi-

tion, the difficulties he encountered as he proceeded with the removal of the cyst and other facts. Likewise, before Dr. Manning was asked concerning the condition of plaintiff's spinal accessory nerve he had described the condition of plaintiff's shoulder from December 3, 1932, when the plaintiff first called upon him, until the day of the trial. He had also described the function of the spinal accessory nerve and outlined the course of treatments he had given to the plaintiff. Since each witness, before expressing his opinion, had delineated the facts upon which he based it, the jury could compare the one with the other and endeavor to determine whether the conclusion was sound. For the reasons stated in *Lippold v. Kidd,* supra, and in the sections of Ruling Case Law above mentioned, we believe that no error was committed when the defendant's objections to these questions were overruled.

■ The defendants next contend that the circuit court erred when it denied their motion for a directed verdict. They argue (1) that the transcript contains no evidence in support of the charge of negligence; (2) that, granted it does, it contains no evidence in support of the averment that the charged negligence was the proximate cause of plaintiff's condition; and (3) that a physician is not liable for an untoward result if medical men of his own school differ in opinion as to the wisdom of the course he pursued.

It will be recalled that the plaintiff was 39 years of age, able-bodied and in good health when he sought the defendant's services, but that after the operation, as appears from the defendant's certificate, ''not more than 25 per cent'' of the usefulness of plaintiff's right arm and shoulder remained, and that he was ''disabled from doing any farm labor and is only able to supervise hired labor''. Evidence indicates that the plaintiff's present condition is the same as described in the

quoted words. The defendants were unable to account for the plaintiff's condition except to state that the operation resulted in "a nerve involvement", yet their testimony shows that a nerve involvement relieves itself in three to six months after it appears. Confronted with this situation, the defendants intimated malingering and testified that a course of exercises is needed to restore normalcy. The record contains substantial evidence showing that under the supervision of Dr. Manning the plaintiff faithfully submitted to treatment, performed exercises and later resumed labor upon his farm, yet, if the witnesses who so testified spoke the truth, the treatment, exercises and labor failed to improve the plaintiff's condition. If this testimony is believed, malingering does not account for plaintiff's present condition. Dr. Manning accounted for it in an entirely different way. He swore that the nerve has been severed. The defendant conceded that a severance of the nerve would be bound to produce the condition that now exists. Both he and Dr. Manning testified that a surgeon, in removing a cyst similar to the plaintiff's, would be guilty of an improper act if he severed this nerve. While the defendant would not testify that a severance of this nerve would be a negligent act, and swore that a severance might occasionally happen "as an accident", yet he testified that no accident of that character happened during the course of this operation. Thus, we have (1) the testimony of a physician, whose competency has not been questioned, that the nerve has been severed; (2) defendant's admission that in removing the cyst it would be improper to sever the nerve unless by "accident"; (3) that no accident occurred during the course of this operation; and (4) that a severance of the nerve would produce the condition that now exists. To us it seems that this testimony consti-

tutes substantial, competent evidence in support of the finding of negligence.

The defendants seem to think that the evidence reveals one or more possible causes besides the alleged negligence to account for the plaintiff's injury, and that it fails to negative these other causes. In the decisions upon which the defendants rely the same witnesses who established the cause for which the defendant was responsible also proved, as competing possible causes, several other causes for which the defendant was not responsible. In those cases when all of the evidence had been assembled it was impossible to say which one of these several causes was responsible for plaintiff's injury. The proof in the instant case establishes a different situation. Dr. Manning, plaintiff's witness, swore that one cause, and one alone, was responsible for plaintiff's condition; that is, a severed nerve. If he is believed—and the jury believed him— the cause of plaintiff's condition has been established. The situation is similar to that disclosed in *Hamilton v. Kelsey*, 126 Or. 26 (268 P. 750), in which we sustained a recovery, even though the defendant's witnesses, as in the present case, refuted the alleged negligence and accounted for the plaintiff's condition with various explanations.

■ The defendants argue that in malpractice actions the rule of res ipsa loquitur is not available, and that the conclusion that plaintiff's nerve was severed must be the result of the application of that rule. The rule of res ipsa loquitur is one of expediency. Until the defendant has substantiated his denials with proof, this rule assumes that a prima facie case of negligence has been made out. No rule of presumptions was employed in this case. Before Dr. Manning testified, the plaintiff and the defendant had given virtually all of the testimony to which we have alluded. When Dr. Manning

testified that the nerve had been severed he was not indulging in a presumption, but based his conclusion upon the facts which he had observed, the history of plaintiff's case, the results of his electrical tests, and the experiences of medical men with similar symptoms. We are clearly satisfied that the finding in plaintiff's favor was in no way the result of the application of the rule of res ipsa loquitur.

The third subdivision of defendant's argument submits that a physician is not responsible for an unfavorable result when his method of treatment is one that is recognized as proper by at least a portion of the medical profession. We fail to perceive how this rule is involved in the present case. The plaintiff does not criticize the defendant's diagnosis of his condition, nor the course of treatment which the defendant adopted, but claims that during the course of the operation defendant wrongfully severed a nerve. Apparently all medical men, including the defendant, agree that if the nerve was severed it was improper to have done so. The issue which the jury determined adversely to the defendant was whether the nerve had been severed; in fact, this was the sole issue in the case, apart from the amount of damages. We conclude that this assignment of error reveals no merit.

■ The next assignment of error submits that the circuit court erred when it permitted plaintiff's witness, Otto Heider, to repeat in rebuttal a statement which he had made some time before the trial to Dr. C. L. Williams, a witness for the defendant. Dr. Williams, during the presentation of the defense, had been asked the following questions and given the following answers:

"Q. Did you have any talk with Mr. Heider later, did they ask you to be a witness here? A. His brother

came to the office, I didn't see him in my office any more. The attorney came to my office.

"Q. What did he say? A. Well, he came in there and brought in some papers that I take it were the preliminary papers that were to be filed with regard to this case, and they were read over and then he said to me that he would be able to pay me for my services as an expert in this case, $25.00 or $50.00 or, if they got a good judgment, he might be able to pay me as much as $75.00 or $100.00, and I said, 'Mr. Heider, there is not much use to talk about that because what I have to say about this case will not be of any benefit to your brother. I don't think you should call me as a witness on your side because I have no evidence in your favor.'"

Mr. Otto Heider, one of the plaintiff's attorneys, was the individual to whom Dr. Williams referred in the above answers. Upon rebuttal he was asked: "What did you tell him?" (referring to Dr. Williams). The defendant's objection that "This is an impeaching witness and he has got to ask an impeaching question" was overruled, and thereupon Mr. Heider testified:

"A. He said he couldn't testify, wouldn't testify for the regular witness fees, and I told him I didn't expect him to, that I knew he was a professional man and he would require more, and I said he would be paid $25.00 for one day and $50.00 for two days, that is where the $50.00 comes in, at $25.00 a day, and finally he told me, he said, 'I won't be a witness for either side at all,' and so I felt there was nothing more I could do there and I left at that time, and there was nothing said about a hundred dollars or contingent on the amount of recovery or anything of the kind."

The defendants argue that this procedure violated the requirements of § 9-1912, Oregon Code 1930, which provides:

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circum-

stances of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them. If the statements be in writing * * *."

It seems to us that if this section of our laws is applicable to the question propounded to Mr. Heider, all of its requirements were complied with, for Dr. Williams himself designated the time, place and persons present when the conversation occurred. But section 9-1912 has no application to this situation. The applicable provision of our code is section 9-1911 which provides:

"A witness may be impeached by the party against whom he was called, by contradictory evidence, or * * *."

Neither of these sections was violated when the court overruled defendant's objection.

■ The last assignment of error is based upon an exception which the defendants obtained to the failure of the trial judge to read to the jury their nine requested instructions. Defendants argue in support of this assignment:

"Defendants were entitled to instructions in regard to their version of the case, and the failure of the court to give these instructions is reversible error."

A study of the instructions has persuaded us that the versions of both parties were carefully pointed out to the jury in the instructions given.

The above disposes of all assignments of error. The judgment of the circuit court is affirmed.

CAMPBELL, C. J., and RAND and BAILEY, JJ., concur.