Argued February 2; affirmed February 24, 1943

# CLEMENS *v.* SMITH

(134 P. (2d) 424)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY and HAY, Associate Justices.

*Frank S. Senn,* of Portland (Casey & Kriesien, of Burns, and Senn & Recken, of Portland, on the brief), for appellant.

*F. J. Lonergan,* of Portland, for respondent.

BELT, J. This is an action to recover damages resulting from the alleged malpractice of the defendant physician and surgeon. Defendant is charged with negligence in that he used non-sterile instruments in removing a cyst from the back of plaintiff's wrist and failed to exercise due care to avoid infection. Plaintiff

alleges that, as a result of such negligence, the tendons and the bone of her wrist became infected and that she has been permanently injured thereby. From a judgment in favor of the plaintiff, the defendant appeals.

 The motions for a nonsuit and a directed verdict present the vital question as to whether there is any substantial evidence tending to show negligence, as alleged, on the part of the defendant and that such negligence was the proximate cause of the alleged injuries. After verdict, the evidence must be viewed in the light most favorable to plaintiff. Plaintiff is entitled to every reasonable inference which can be drawn from the evidence. It is not for this court to weigh conflicting evidence or to substitute its judgment on a question of fact for that of the jury. When a cause has been properly submitted to a jury, its verdict is conclusive if there is any substantial evidence to support it. The statement of facts will be made in keeping with these fundamental principles.

██ Mrs. Beatrice Clemens is a young woman 27 years of age and a graduate of the University of Washington in bacteriology. After graduation, she was employed in 1935 in a small hospital at Burns, Oregon, as a laboratory technician, where she worked for about two years. On June 5, 1939, after she had ceased working as a laboratory technician, she secured the services of the defendant—who was then in charge of the hospital—to remove a cyst or ganglion from the back of her wrist.

The operation, which was performed in a dressing room and not in the main surgery, was thus described by the plaintiff:

"Q. Well, now, when you got into the dressing room what did you proceed to do? A. I was placed

on the examination table, which has a board extending out for my arm to rest upon, and Doctor Smith proceeded to operate on the cyst.

"Q. Now in the performance of this operation, Mrs. Clemens, were there a number of surgical instruments used? A. Yes.

"Q. And where were these surgical instruments kept during the time this operation was in progress? A. Those he had not used were kept on a table to his right and near, where he could lift them up. Those that he had used were placed on the board and picked up again, from the board where the arm was resting.

"Q. These instruments were used at various times during the operation? A. Yes, repeatedly.

"Q. What period of time did this operation consume, from the time that he made the incision until you left the table; how much time was consumed there? A. It was at least an hour and a half, I would say.

"Q. Do you know what some of the instruments were that were used in the course of this operation? A. There was a scalpel for making the incision.

* * * * * *

"Q. A surgical knife? A. Yes. There were probes and scissors, too.

"Q. During the course of the operation, and during the course of the hour and a half, these instruments that you have mentioned were used alternately by the doctor? A. Yes, sir.

"Q. And after being used were laid down again on the board where your arm was? A. Yes.

* * * * * *

"Q. Did the doctor have his hands encased in any rubber gloves? A. No, he didn't.

"Q. Did he wear any mask? A. No.

"Q. Or any surgical robe? A. No.

"Q. His face was not covered by a mask at all? A. No."

After the operation was performed plaintiff went to her home but returned the next day to have the dressing changed. She states that her wrist began to swell and discharge the second day after the operation. She went to the hospital as a patient on June 7th and, with the exception of a few days, remained there until the 29th of June. During this time, while under the continuous treatment of the defendant, her wrist became progressively worse. Plaintiff, on June 29th, was taken by airplane from Burns to a hospital at Olympia, Washington, where she was treated by her family physician, Dr. F. H. Hartung.

Dr. Hartung testified:

"Q. Doctor, this cyst that you have mentioned that was apparently on the wrist of the plaintiff, which you learned through the history of the case, would any infection come from that cyst, in and of itself? A. No, sir.

"Q. Could the infection that you found in the wrist of the plaintiff have come from unsterile instruments? A. Yes, sir, either unsterile instruments or not a complete antisepsis in preparation.

"Q. An infection of the kind that you observed and treated for the plaintiff was the kind that you say comes from those sources you just mentioned? A. Yes, sir.

"Q. Doctor, assuming that the plaintiff went to a doctor for treatment and removal of the cyst on the left wrist and that the doctor undertook to perform the operation and give the treatment in his office and that the instruments that were used for the operation were lying out in the open on a table for a period of one and a half hours or more, would you say those instruments would have remained sterile all that time? A. Definitely not.

"Q. And assuming further that a doctor in the performance of the treatment and operation had no rubber gloves or other covering of the hands and

handled the instruments from time to time during that period of one and a half hours or more, would you say that they would be sterile? A. Absolutely no.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. Would you say that that would be a proper practice under any circumstances? A. No, sir.

"Q. Doctor, is it a relatively easy matter to keep instruments for operative purposes in a sterile condition even while using them in and about the office? A. Yes, sir.

"Q. Assuming, doctor, further, that instruments were sterilized by boiling or what—or other recognized means and then laid out on the table and used from time to time, how long would you say in your opinion those instruments would remain sterile after being removed from the sterilizer? A. In ordinary operative procedure, under the most careful of procedure, such as an operating room the instruments are never uncovered until the operation begins. They are covered completely until the time of operation. It is assumed that from that period on, that those instruments might at any time become contaminated. Even under the most rigid conditions instruments once uncovered will not remain sterile.

"Q. If instruments are left out for an hour or more, would you say that it is safe to use them then? A. It is never safe to use instruments only after a short period in the open.

"Q. What would you say you mean by a short period of time? A. Immediately."

Plaintiff remained in the hospital at Olympia until July 11th but was under the care of Dr. Hartung until March, 1940.

P. W. Clemens, husband of the plaintiff, testified that in a conversation with defendant the latter ad-

mitted that "he had made a mistake in not taking her to a sterile room to avoid infection."

In fairness to the defendant—although it is beside the question here—there was evidence tending to show that due care was exercised by him in the performance of the operation; that the instruments were sterile; and that, while not being used in the course of the operation, the instruments were placed on sterile towels.

Accepting as true the evidence offered on behalf of the plaintiff, we think it is sufficient to justify submission of the cause to the jury. It was not incumbent upon the plaintiff to prove by direct and positive evidence that the infection came from the use of non-sterile instruments. Infection is of such a subtle nature that its cause can be determined with only a reasonable degree of certainty. Defendant was operating in a non-infected area. According to Dr. Hartung, the infection did not come from the cyst itself but from the kind of germ that could come from unclean instruments. Defendant testified that, in his opinion, the infection came from the blood stream but gave no reason therefor except that based upon what some nurse had told him. The defendant did not take any blood tests, as did Dr. Hartung, so we think the jury was not bound to accept such opinion as conclusive.

All expert witnesses agree that sterile instruments should be used in surgical operations whether they be performed in Burns or New York City. From the evidence relative to the exposure of the instruments for a period of one and one-half hours and the manner in which they were handled, we think it is a reasonable inference that the instruments used were not sterile and that the failure of the defendant to exercise due care resulted in the introduction of a germ causing the in-

fection. We have no hesitancy in holding that the use of non-sterile instruments is evidence of negligence.

██ Was such negligence the proximate cause of the infection? In our opinion, such question was for the determination of the jury. The evidence failed to show with any degree of probability that the infection came from any source other than that of non-sterile instruments. This is not a case where the jury was left to speculate as between two or more possible causes of an injury. Neither is it one where negligence is predicated on the mere fact in itself that infection occurred as a result of the operation. We are thoroughly in accord with the well-recognized principle of law in malpractice cases that a surgeon is not a guarantor of good results.

■ As stated in *Lippold v. Kidd,* 126 Or. 160, 269 P. 210, 59 A. L. R. 875:

"The law does not demand of a plaintiff that he establish with certainty the proximate cause of his injury. If the proof shows that a certain factor probably bore to injury the relationship of cause, the law is satisfied and denominates it the proximate cause."

In *Helland v. Bridenstine,* 55 Wash. 470, 104 P. 626, an action to recover damages resulting from the use by a physician and surgeon of non-sterile instruments, the court, in commenting upon the sufficiency of the evidence, said:

"The respondent was not required to prove her case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that she show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable."

The following language of the Supreme Court of California in *Barham v. Widing*, 210 Cal. 206, 291 P. 173, is particularly applicable to the facts in this case:

"Under the circumstances of this case there is a remote possibility that the infection developed from some cause other than the defendant's failure to sterilize the needle or the gum into which it was inserted, but the evidence is sufficient upon which to warrant the jury in finding that it was caused by his negligence in failing to follow these reasonable precautions in spite of his testimony to the contrary."

Quoting from *Ley v. Bishopp*, 88 Cal. App. 313, 263 P. 369, the court continued:

"It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment."

▆▆▆▆ Error is predicated upon the giving of the following instruction:

"I instruct you that negligence consists in the doing of something which an ordinarily careful and prudent person would not do in the same or similar circumstances; or negligence consists in the failure to do something which an ordinary careful and prudent person would not fail to do in the same or similar circumstances."

This instruction must be considered in the light of another instruction on the same subject, viz, that:

"I instruct you that Dr. Smith was not a guarantor or insurer of cures. He did not guarantee or insure that he would get a good result. All the law required of him was to exercise that degree

of care and skill which is ordinarily and usually exercised by the ordinary careful physicians and surgeons in localities like Burns, and if he did that, then he has complied with the law and would not be liable in this case."

The first instruction is subject to criticism but we think it did not mislead the jury nor was it prejudicial to defendant. As a matter of fact, it was unduly favorable to the defendant: *Carruthers v. Phillips,* 169 Or. 636, 131 P. (2d) 193. The second above-quoted instruction is a clear and accurate statement of the law. We assume that the jury was constituted of men and women of ordinary intelligence who knew that a doctor, and not a layman, was the defendant in the case and were fully apprised as to the standard of care by which he was to be judged.

■ Error is assigned because the court, in substance, instructed the jury that if the defendant used "non-sterile or unclean" instruments, as alleged in the complaint, such conduct would constitute negligence. We think it is not too exacting in this modern age of science to require physicians and surgeons to use sterile instruments where there is every facility available to make them so. There was a time in the dim and misty past when it was thought necessary for the surgeon to wash his hands after the operation but not before. Needless to say, that day has long since passed. It may be said to the credit of the defendant that he does not undertake to justify the use of unclean instruments. It is his position—and there is much evidence to sustain it—that the instruments used were absolutely sterile and that the operation was performed in keeping with the standards of his profession.

The judgment is affirmed.