Argued September 20, affirmed November 5, 1971

STATE OF OREGON, *Respondent, v.* RICHARD
RUBEN NORTON, *Appellant.*

490 P2d 194

*Gordon G. Carlson,* Roseburg, argued the cause for appellant. With him on the brief was Eldon F. Caley, Roseburg.

*Doyle L. Schiffman,* District Attorney, Roseburg, argued the cause and filed the brief for respondent.

Before SCHWAB, Chief Judge, and LANGTRY and THORNTON, Judges.

LANGTRY, J.

Defendant appeals from conviction of first degree murder of Floyd Jackson. Defendant admitted to shooting and killing Jackson, Jackson's wife, and the defendant's wife who was the daughter of the Jacksons. His principal defense was that he was insane at the time of the killing. ORS 135.870.

Errors assigned are:

(1). Certain testimony of psychiatrists should

have been stricken on defendant's motion, and that other should not have been received over objection. (Included in three assignments.)

(2). The court's instruction on intoxication was erroneous.

(3). An instruction on transferred intent to kill was erroneous.

Defendant and his wife were estranged and she, with their two-year-old son, was living at Winston in Douglas County with her parents while attending school. Defendant was living at Talent in Jackson County and attending college in Ashland. Defendant's father also lived alone in the Winston area. The evidence discloses that on the night of June 10, 1970, defendant drove his automobile from Talent to Winston, a considerable distance away, taking with him a 12-gauge riot shotgun containing eight shells which were loaded with buckshot-size pellets. He carried extra ammunition in a web belt. Defendant testified that he went first to his father's house, found no one there, drank some beer, and then went to the victims' residence a short distance away. (During a recess in the trial, defendant told his father that it had been his intention to kill him, also.) He testified that he looked in windows of the Jackson house and tried the back door without gaining entry. Through a window he saw Mr. Jackson sitting in a chair talking to defendant's wife. On direct examination he testified:

> "Well, Nancy was sitting by him and they were talking. It seemed like they kept saying 'motorcycle club' over and over and over. Well, then, I shot."

Moving to the front door of the house, he shot a burst of shots. The evidence indicates this burst killed Jack-

son's wife, who was also in the living room, and mortally wounded defendant's wife. Circumstantial evidence made it appear that he fired one shot which did not strike a victim. He fled the scene and at a service station telephone booth he called police and waited for them to apprehend him.

The prosecution's rebuttal to his evidence concerning insanity disclosed that on a previous occasion the defendant had used the same shotgun in a domestic conflict with his wife. A neighbor and defendant's wife were in another room talking to defendant through the wall, trying to get him to bring the Norton's baby out of a bedroom where he had isolated himself with the baby. He shot a hole in the wall and the shot passed between his wife and the neighbor, who were standing side by side. On that occasion he threatened to again use the gun against his wife. The neighbor's testimony was that the wife feared he would kill her.

Defendant had had gastric trouble and by surgery had had a large section of his stomach removed. In the weeks preceding the killings he had gone to a doctor for continued similar trouble and the doctor had prescribed tranquilizers for him, cautioning that when he used them he should not ingest alcohol. He told officers, and also testified vaguely, that he had taken tranquilizer pills the day of the killings. The evidence discloses nothing about how many he may have taken. He testified that he drank six to eight stubbies of beer. Those who observed him immediately after the killings smelled alcohol on his breath, but were of the opinion that he was calm and sober after several minutes of crying and emotional reactions when the police officers first apprehended him. With-

in a few hours he voluntarily gave a taped statement to officers and the district attorney. It was received in evidence and played to the jury. In it, besides recounting preceding events, he stated in answer to questions that he knew how to use the shotgun, that its use could kill, and that the killing was legally wrong, and he volunteered that it was also wrong under God's law.

■ A psychologist and three psychiatrists testified at the trial. Ivor Campbell, M.D., one of the psychiatrists, had been retained by the prosecution but he was initially called by the defendant as a witness. The defendant also called the psychologist and one of the other psychiatrists. Barbara Radmore, M. D., a psychiatrist from the state hospital where the defendant had been committed for diagnosis pursuant to ORS 137.072 and 137.075, testified for the prosecution. The latter section provides that the immunities detailed in ORS 137.115 are applicable when there has been such a diagnosis. ORS 137.115 provides:

> "(1) No statement made by a * * * person in the course of an examination * * * shall be used against him in any * * * criminal proceeding.
> "(2) No person shall, without the consent of the * * * person, be examined * * * as to any statement made by the * * * person in the course of the examination.
> "* * * * * *"

At the trial, the exercise of these immunities prevented the state hospital phychiatrist's testimony about her conclusions from being supported by her testimony about what the defendant had told her. The defendant contends, therefore, there was no predicate for her opinion in evidence and her conclusions should have been stricken. This forms part of the basis for the first claim of error.

(1). Defendant relies upon language in *Lippold v. Kidd,* 126 Or 160, 168-69, 269 P 210, 59 ALR 875 (1928), where the court quoted with approval from *Kempsey v. McGinniss,* 21 Mich 123, 2 Brown N P 49 (1870). In that case the court said that where the facts on which an opinion is based are in conflict, the only proper mode of interrogating the professional witness is by stating and enumerating in the question itself the facts to be assumed. In the instant case we do not view the facts on which the opinion was based as being in conflict. The essential facts leading up to and following the killings were not a subject of disagreement between the prosecution and the defendant. In this circumstance we think that the general rule stated in *Lippold v. Kidd,* supra, applies:

> "* * * [I]f the expert testifies to a conclusion based upon a premise with which he has become familiar through personal observation, the question which elicits from him the conclusion need not be a hypothetical one. In such an instance he supplies both premise and conclusion. But where he is unfamiliar with the premise and is asked to express a conclusion, a premise must be stated to him in a hypothetical form * * *." 126 Or at 166.

*See also, Carnine v. Tibbetts,* 158 Or 21, 38-39, 74 P 974 (1937). In *State v. Beeson,* 248 Or 411, 413, 434 P2d 460 (1967), the court said:

> "The objection to the question asking the [medical] witness his findings was correctly overruled. Medical findings or opinions may be based, at least in part, upon the history given by the patient. See *Lewis v. Baker,* 243 Or 317, 326, 413 P2d 400 (1966)."

■ Defendant also makes the point that Dr. Radmore had testified that part of her opinion was based upon psychological testing done by someone else. The

psychologist who did that testing had not testified at the trial. Defendant contends that because the psychological testing and its results were not before the jury, Dr. Radmore's opinion could not be before the jury. We think the rule stated in *State v. Beeson,* supra, and *Lewis v. Baker,* cited therein, is broad enough to cover this point. We also note that on defendant's cross-examination of Dr. Radmore she stated that she could base her opinion entirely upon what she had heard in the courtroom, and particularly emphasized that her opinion related to what the defendant himself had said in his extensive testimony.

■ The defendant contends that testimony elicited from the prosecution's examination of Dr. Campbell should have been stricken. Dr. Campbell first was called by the defendant, although he had been retained by the prosecution. The transcript of the testimony in question is too extensive to set out herein. It dealt with characteristics of a sociopathic person and how the defendant fit into that category. We conclude that the evidence was relevant and properly permitted in evidence by the trial court, which may exercise discretion in such matters.[1]

■ Defendant also contends that no predicate existed for Dr. Campbell's opinion testimony. His testimony as a whole was based upon the evidence which had been heard by the jury. Therefore, the general rule quoted supra from *Lippold* applies.

■ Dr. Radmore was asked whether she had determined if the defendant "is commitable." She answered, "That he is not commitable," because "I do not

---

[1] "* * * [T]he scope and conduct of the examination [of expert witnesses] are properly committed to the sound discretion of the trial judge * * *." 32 CJS 507, 510, Evidence § 549 (1964).

believe that the defendant would benefit from being hospitalized in a mental institution." Defendant moved to strike this testimony because it was irrelevant. His point in this regard was that the mental condition of the defendant at the time of trial had no relevancy to his mental condition at the time of the killings. Questions to the same effect were asked of other expert witnesses.

In *State v. Gilmore,* 242 Or 463, 410 P2d 240 (1966), a question was whether an order of commitment to a mental institution at a different time than when the crime was committed should have been received in evidence. There was 20 days' difference in time there. The court said it was error not to have received the offered order of commitment, saying:

"* * * [A]ny finding on any aspect of the defendant's mental condition would be relevant and of assistance to the jury in reaching its most difficult decision." 242 Or at 466.

As we have mentioned, the defense called two psychiatrists and one psychologist as witnesses, and the state called one psychiatrist. One of those whom the defendant called had been retained by the state. These experts testified unequivocally that in their opinion at the time the crime was committed the defendant had the ability to distinguish between right and wrong and that he knew the nature and quality of the acts which he committed. What the court said in *Lewis v. Baker,* 243 Or 317, 327, 413 P2d 400 (1966), is applicable here:

"* * * [H]ypothetical questions could have been used with certain witnesses to a greater degree * * * but we find no reversible error in the sense that incompetent evidence was received."

The defendant's electronically taped statement made shortly after the killings was heard by the jury and the defendant testified at length during the trial. The jury was properly instructed on the defense of insanity. We see no reason for disturbing the jury's verdict on account of any of the claimed errors relating to the psychiatric testimony.

■ (2). The defendant requested an involved instruction relating to voluntary intoxication. The court gave a different instruction.②

In *State v. Roisland*, 1 Or App 68, 459 P2d 555 (1969), we held that ORS 136.400 applies to voluntary consumption of drugs as well as alcohol. Defendant claims the court erred because its instruction did not differentiate between prescribed drugs and illegal drugs. We do not need to consider this point because the doctor who prescribed the tranquilizers for the defendant testified that he had cautioned the defendant against using alcohol at a time when he was using the drugs. Defendant's testimony about use of the drugs on the day in question was vague, but he made it clear that he had had six to eight stubbies of beer, two of them shortly before the killings. The in-

---

② "The effect in law of voluntary intoxication or under the influence of drugs is this: no act committed by a person while in a state of voluntary intoxication or under the influence of drugs shall be deemed less criminal by reason of his being in such condition. But whenever the actual existence of any particular mental capacity, motive, purpose or intent is a necessary element to constitute any particular degree of crime, or excuse for wrongful acts, the jury may take into consideration the fact, if it was a fact, that the defendant was intoxicated or under the influence of drugs at the time, in determining the purpose, motive or intent or legal insanity at the time of or with which he committed the act.

"The foregoing rule applies to intoxication or any abnormal state of mind caused by the influence of drugs."

struction given presented to the jury the law applicable to the evidence.[9]

■ (3). Defendant asserts that the following instruction was erroneous.

> "If you find that the state has proved the elements of the charge in the indictment beyond a reasonable doubt except that defendant in attempting to shoot another person in the Jackson home missed or shot wild and killed Floyd Jackson rather than his intended victim, if any, then defendant would be guilty as though he intended to kill Floyd Jackson."

Neither defendant's testimony nor the other evidence supported the giving of this instruction. Not in his testimony or his statement can we find that defendant contended he hit other than the victims at whom he shot. The instruction should not have been given, but it was harmless error.

Affirmed.

---

[9] The language of the instruction, while not precise and could be improved upon, sufficiently informed the jury of the applicable law.