Argued November 13, affirmed November 28, 1951, petition for
rehearing denied January 23, 1952

ALLEN ᴇᴛ ᴜх. *v.* McCORMICK

238 P. 2d 220

*W. P. Riddlesbarger* argued the cause for appellants. On the brief were Bryson, Riddlesbarger & Bryson, of Eugene.

*Herman P. Hendershott,* of Eugene, and *R. B. Carmichael,* of Springfield, argued the cause and filed a brief for respondent and cross-appellant.

Before BRAND, Chief Justice, and LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit for an injunction and for damages, brought by John T. Allen and Helena S. Allen, husband and wife, as plaintiffs, against J. J. McCormick, as defendant. By his affirmative answer and counterclaim, defendant sought an injunction against plaintiffs and also damages. The trial court entered a decree (1) allowing plaintiffs an injunction, (2) denying damages to plaintiffs, and (3) dismissing defendant's prayer for an injunction and damages. Plaintiffs appeal, and defendant cross-appeals.

Plaintiffs own 200 acres of land located in township 16 South of range 5 West of the Willamette meridian, in Lane county, Oregon. Defendant owns 235 acres of land located in the same township and range, which adjoin plaintiffs' lands on the north. On the north portion of plaintiffs' holdings, and immediately adjacent to defendant's property, is a forty-acre tract. It is this latter land that is chiefly involved in these proceedings. All of these lands are within the large area covered by the Willamette valley flood control.

The general downward slope and drainage of all these lands is in a northeasterly direction. The slope to the northeast through plaintiffs' property is very slight, dropping approximately six inches to the mile. Hence, all of plaintiffs' land, except a very small portion, is comparatively level. This includes the forty-acre tract.

Bear creek is now, and from time immemorial has been, a natural stream, the channel of which, until straightened as hereafter denoted, meandered across plaintiffs' lands in a general northeasterly direction and thence, in the same direction, across defendant's lands. It is an all-year running stream into which surface water, seepage, rainfall, flood waters, and other waters have drained and do now drain from the lands adjacent thereto. Several other streams also flow into Bear creek, three of them on plaintiffs' property. Such waters flowed from the lands of plaintiffs and through defendant's lands in said Bear creek channel, providing a beneficial drainage for said waters through and over the respective properties of the parties herein and a source of outlet therefor.

Plaintiffs complain that because of the erection and maintenance by defendant of a dam in Bear creek about 40 feet north of the boundary line between their respective lands, the regular and unobstructed flow of waters from their land is prevented, causing the water level in Bear creek to rise, particularly through said forty-acre tract, to their damage. This forms the basis of their prayer for injunctive relief and damages. Defendant, on the other hand, asserts that by reason of the straightening, widening, and deepening of the Bear creek channel and its tributaries by plaintiffs in 1947, there resulted a substantial increase in the rate of flow and volume of water carried from plain-

tiffs' lands into Bear creek, causing an overflow and the flooding of defendant's property, resulting in damage thereto by erosion and the removal of topsoil therefrom. This is the gist of defendant's claim for injunctive relief and damages.

In 1942 defendant constructed a small dam in Bear creek about 65 feet north of the boundary line between plaintiffs and defendant. This dam remained there for three years, when it was washed out. In 1945 he constructed a new dam at its present location. This dam was torn out by plaintiffs in 1947, but defendant reconstructed it. This dam raises the water level of Bear creek approximately one foot, except in time of flood waters. In time of flood waters it has no effect upon the water levels.

In 1947 one Carlisle Pickett, a civil engineer employed by the Lane county soil conservation service, inspected this dam. He set a marker in Bear creek near its bank immediately south of the dam. It was a wooden marker into which he had driven nails on both sides. The place on the marker where the nails were driven marked the height above which the water should not be permitted to rise. The testimony indicates that thereafter, except during floods, defendant did not permit his dam to raise the water level above the height set. These nails were on a level equivalent to one foot below the surface of the land adjacent to Bear creek, including the forty-acre tract. Explaining why he determined upon this level, Pickett testified.

"Q  You had noticed at the bottom end of Mr. Allen's land that the stream current was slow?

"A  Yes.

"Q  When you put the hubs in what did you find?

"A  Well, I consulted the state engineer and we decided that the soil type of that formation,

that if the water table was kept down a foot below the lower part of the surface of the land there would be no damage and so we established it that way, by taking the levels and taking the average and then putting it down a foot below that level.

"Q You ran the levels of the stream at the time?

"A Ran the levels of the field and of the stream too, yes."

Pickett also testified that the state engineer, in effect, ordered defendant to remove the dam from its then location, and that he also recommended, in the event the dam was rebuilt, that it be rebuilt farther downstream, so it would not affect the lands of plaintiffs.

The type of soil existing on the lands of plaintiffs and defendant is well described by Thomas O. Russell, a civil engineer with many years' experience. Russell organized the Willamette Valley Flood Control Association and was its first secretary. He possesses an expert knowledge of all soil conditions and drainage problems existing in that portion of the Willamette valley involved in this litigation. He testified:

"Q Are you acquainted and did you observe the formation of the soil of the land adjacent to the McCormick dam?

"A Yes.

"Q What did you find?

"A Well, it is the customary type of what we call Willamette Valley [a]dobe. It is found pretty well throughout the upper regions of the Willamette, above the sandy bottom land, and the Long Tom.

"Q Is there another formation of soil on top of the [a]dobe?

"A In some instances there is but very frequently throughout the bottom land the [a]dobe

has been worked enough to make it friable and to a certain degree changes its nature. Below where the plowing is, why, the character of the soil has not been changed from what it was when it was laid down.

"Q What is that surface?

"A It is a very stiff ardulacious clay material, attrition of very dense basalt rock in the valley.

"Q Does this adobe absorb or is it impervious to water?

"A It will absorb a certain amount of water but it is characterized as impervious material, that is, by the U. S. Army Engineers, who removed the top soil and put it into the Fern Ridge dam and into the Coast Fork Dam and Row River Dam, and the interior of their earth fill, to constitute what they call an impervious core.

"Q And when water or moisture is on top of this type of soil how is the water removed? How does it get off?

"A Well, that that isn't dissipated by the thin coating of top soil has to go off by evaporation.

"Q Is that true of the soil of Mr. McCormick's land?

"A In general, yes.

"Q And how about Mr. Allen's land?

"A From what I have seen along the creek it is pretty much the same land all the way through.

\* \* \*

"Q But that field immediately adjoins Mr. McCormick's property and you would say it was of that type?

"A It has the same characteristics of thousands of acres of that kind in the valley."

In 1947 plaintiffs improved the channel of Bear creek through their property. As before observed, prior to these improvements it was a meandering creek,

about 12 to 16 feet wide and 4 feet deep. Plaintiffs straightened the channel, widened it to 20 feet between banks, and increased the depth to 5 feet. They removed brush and other debris therefrom. Also, in 1947 defendant dug a ditch from Bear creek in an easterly direction parallel with the boundary line between plaintiffs and defendant, about 40 feet therefrom. This ditch terminated near the northeasterly corner of the forty-acre tract. Plaintiff John T. Allen contends that the use of this ditch causes water to run into his field "by a kind of—I would call it sub-irrigation."

Prior to 1938 the forty-acre tract remained more or less in its natural state, covered with brush, blade grass, and swamp weeds. In 1938 plaintiffs cleared this land and sowed it to rye grass. They harvested rye grass seed therefrom each year thereafter, to and including 1943. After that, according to plaintiffs, they were unable to farm this land, owing to its damp and soft condition in August and September of each year, when it was necessary for them to plow in order to sow the seed for rye grass to be harvested the next year. During the years they were utilizing the entire forty-acre tract, plaintiff John T. Allen claimed he realized an annual net profit therefrom of $1500, the land producing an average yield of 600 pounds of seed to the acre. It is contended by plaintiffs that the maintenance of the dam in Bear creek after 1942, together with the use of the ditch after its construction by defendant in 1947, caused the conditions which prevented their use of the 40 acres.

The evidence discloses that at times dams were made by beavers in the stream on plaintiffs' property, and huge quantities of brush and other debris accumulated in Bear creek south of the boundary line between plaintiffs and defendant above defendant's dam, caus-

ing the flow of water in the stream to be retarded and raising its level. At one time in 1947 this brush and debris had accumulated at a point near such boundary line to such an extent as to form a substantial dam in and of itself, and it was necessary to use blasting powder to break it up. These conditions existed at all the times mentioned in the evidence in this case, and plaintiffs frequently were required to clean out Bear creek. Furthermore, the evidence discloses that every year flood waters overflow Bear creek and spread over and submerge the adjacent lands for long periods of time. These flood waters carry silt and other debris onto such neighboring properties. For years duck blinds have been constructed on the forty-acre tract, as well as upon adjacent lands of defendant, and in the fall of each year persons have waded the waters and hunted ducks thereon. In fact, as of the present time, defendant's principal occupation is leasing duck-hunting rights on his premises. In the absence of natural flood waters, he uses Bear creek waters to create duck ponds.

Although the trial court entered a decree in favor of plaintiffs that perpetually restrains defendant from "in any wise diverting or obstructing the waters of Bear Creek at any point on Defendant's land so that any such diverted or obstructed waters shall again flow or seep or back up upon the Plaintiffs' lands adjacent to Bear Creek," nevertheless, the court refused to allow any damages to plaintiffs against defendant, because, as its findings of fact disclose:

"That during said years the Willamette Valley, and particularly the area involved, including both the Plaintiffs' and the Defendant's lands, experienced an extra amount of rainfall, and prolonged flood seasons were experienced, and that during said flood seasons both the Plaintiffs' and the De-

fendant's lands were completely submerged with surface waters, with such duration and strength of flow as to wash, destroy and sour extensive acreages of surface soil within the area. *That the cause of wetting and souring of the Plaintiffs' lands and the extent thereof is not discernible nor traceable to the maintenance of the dam, obstructions and ditch by the Defendant as aforesaid, nor is Plaintiffs' damage, if any there be, measurable from the proof offered.''* (Italics ours.)

Plaintiffs' sole contention upon this appeal is that the trial court erred in refusing to award them damages. Much of plaintiffs' brief is devoted to a discussion of the measure of damages in cases similar to this. It is unnecessary for us to discuss the authorities called to our attention. If the damage of which plaintiffs complain cannot, with some degree of certainty, be traced to defendant's alleged wrongful acts, then no question as to the measurement of damages arises.

■ In 15 Am Jur, Damages, 413, § 22, the rule is stated thus:

''The damages recovered in any case must be shown with reasonable certainty both as to their nature *and in respect of the cause from which they proceed.* No recovery can be had where it is uncertain whether the plaintiff suffered any damages unless it is established with reasonable certainty that the damages sought resulted from the act complained of. *Hence, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from some other cause,* or where it is impossible to say what, if any, portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself.'' (Italics ours.)

See also 8 RCL, Damages, 438, § 12.

■ Plaintiffs contend they are entitled to recover $500 in damages from defendant, largely because of alleged injury to the fertility of the soil on the forty-acre tract. They say it will require that sum of money to restore such fertility and remove the brush and weeds. There is no substantial evidence in the record tending to prove such injury. The claim is based entirely upon the purely speculative testimony of the plaintiff John T. Allen. Aside from his testimony to be quoted, we do not find anything in the record tending to establish the fact that the soil of plaintiffs' lands became sour, as mentioned in the court's findings, because of water damage. Allen testified:

"Q Now has the presence of an increased amount of water on the land affected the land in any way as to its fertility, and so forth?
"A Well, *a person really don't know that until it is cleaned up again.*

"Q Would it be necessary for you to undertake that expense to get it in condition for farming again?
"A Yes. It would be very expensive, get the fertility there, and get the brush and stuff off of it and reclaim it.

"Q Will you have to put any fertilization, fertilizer or chemical upon the land?
"A I *imagine* we will.

"Q What?
"A Well, nitrogen probably.
"* * * * *

"Q You have no idea what it would cost?
"A I am satisfied it would cost $500.00." (Italics ours.)

■ It further is plaintiffs' position that, because they were unable to farm the forty-acre tract after 1943, it follows that the cause thereof must necessarily have

been the construction of defendant's dam in 1942 and its maintenance thereafter, together with the use of the ditch, beginning in 1947, and, therefore, they are entitled to damages for loss of use of that land. In passing, we note that there is a sharp dispute in the testimony respecting the farming of the 40 acres during and after 1944. Defendant offered evidence that plaintiffs did farm it each year. But irrespective of that conflict in the testimony, and taking plaintiffs' evidence at face value, there is no substantial evidence whatever in the record which directly traces any injury to plaintiffs' lands from the maintenance of defendant's dam or his ditch. At best, there is but a remote connection between the alleged causes and the claimed effects. It is reasonable to infer that the backing up of the waters of Bear creek, on account of the dam, did have some slight effect on the forty-acre tract; yet it is wholly impossible to separate that effect from the injurious effects that must necessarily have arisen from the natural flood waters and from the raising of the water level on account of the brush and other debris collecting in the stream from plaintiffs' property.

■ We agree with the able trial judge that to allow damages to plaintiffs under all the facts and circumstances of this case would require us to enter the realms of pure conjecture and speculation, something which we are not permitted to do.

We have examined the record with care and conclude therefrom that the trial court did not err in granting injunctive relief to plaintiffs without an award of damages, nor in denying affirmative relief to defendant. The decree is affirmed.

Neither party shall recover costs.