Argued October 14, reversed with instructions November 26, 1952,
petition for rehearing denied March 25, 1953

# WINTERSTEEN *v.* SEMLER

250 P. 2d 420
255 P. 2d 138

*Norman L. Easley,* of Portland, argued the cause for appellant. With him on the briefs were Griffith, Phillips & Coughlin, of Portland, and Lloyd M. Mc-Cormick, of Portland.

*Irving Korn,* of Portland, argued the cause for respondent. On the brief were Krause, Evans & Korn, of Portland, and Elam Amstutz, of Portland.

Before Brand, Chief Justice, and Rossman, Lusk, Latourette and Tooze, Justices.

## LATOURETTE, J.

This is an appeal by defendant Harry Semler, a dentist, in a malpractice case, from a judgment after verdict assessing damages against him in the sum of $75,000. At the conclusion of the taking of testimony, defendant, by timely motions, moved for a directed verdict, and, after judgment, for a judgment notwithstanding the verdict, or, in the alternative, for a new trial, on the grounds that as a matter of law the evidence failed to show any negligence on the part of defendant which was the proximate cause of plaintiff's injuries, which motions were denied by the trial court. On the appeal, it is again urged that there is no substantial evidence of negligence or proximate cause warranting the submission of the case to the jury.

It is alleged in plaintiff's second amended complaint that defendant was negligent in the following particulars:

"Defendants failed to take the necessary and reasonable precautions immediately after the extraction of plaintiff's teeth to avoid foreign sub-

stances entering and passing down plaintiff's throat and trachea.

"Defendants failed, refused and neglected to secure any medical or dental or any other kind of post operative assistance or aid or counsel for plaintiff after being advised of her complaints, pains and symptoms as aforealleged.

"On or about July 19, 1948 plaintiff advised defendants that she was having repeated and violent coughing spells, that during said time she was discharging from her mouth a foul, greenish, bile-like substance, that she was unable to sleep at night because of said coughing spells and the discharging of said substance, that she was unable to keep food on her stomach except milk and anacin, and that she felt in a generally weakened physical condition, at which time defendants negligently led plaintiff to believe that her symptoms, pain, and sufferings complained of as aforesaid were commonly associated with the after effects of extractions.";

that as the proximate result of such negligence, plaintiff alleges that she suffered certain injuries, including an abscessed lung, which necessitated several operations, the removal of several ribs, and the placing of drainage tubes in her back to expel the purulent matter, whereby she sustained permanent injury.

The evidence discloses that plaintiff, suffering from pyorrhea over a number of years, went to defendant's office on the morning of July 10, 1948, to have her remaining 17 teeth extracted. A general anesthetic was administered to her, whereupon her teeth were extracted and false ones inserted. Oxygen was administered to her to bring her out of her coma, whereupon she was walked to an adjoining recovery room and placed on a cot. Thereafter Nurse Magner, according to the testimony of plaintiff's husband, went to the waiting room to summon him to the door of the recovery

room, whereupon he entered and the nurse left. He testified that when he first saw plaintiff she was lying prone on her back with her head turned to the right. He tried to revive her by shaking her shoulder but there was no response. After remaining in the recovery room for a period of about five minutes, plaintiff regained consciousness. A nurse then brought in a card of instructions for care and a bottle of mouthwash. Plaintiff was asked to return on Monday, July 12, for examination, which she did. At that time a nurse removed her plates and asked her to rinse out her mouth, after which she was examined by Doctor Burton, who told her that everything was "fine", and she was asked to return to the office in a week.

Late that night or early the next morning, she commenced getting a "funny sensation" with choking, coughing and vomiting. This condition continued for the following week. She felt very weak, was unable to sleep and had no appetite. She was only able to retain milk and took many anacin tablets as these had been recommended on the instruction card in case she felt the need for medication.

Upon the following Monday, July 19, she returned to the defendant's office to have the sutures removed. A Nurse Schamel performed this act, and plaintiff informed her that she had been "terribly ill" all week, describing her symptoms. The nurse assured her that "that was the natural thing after the extraction of teeth." On August 2, she again returned to the dental office but only to make a payment and did not talk to anyone about her condition.

Plaintiff testified that her physical condition became worse and that she went to Doctor Tuhy, who, on October 28, 1948, operated, removed a part of one

rib and found an abscess of the right lung. She was hospitalized 11 days after this operation, and around the first part of December underwent another operation for the removal of another abscess.

Turning to the alleged negligence of defendant, it is plaintiff's theory, on the first allegation of negligence, that the defendant was negligent in placing plaintiff on her back rather than on her side on the cot following the extraction of her teeth, she being in an unconscious condition, thereby causing foreign material to pass down her trachea which resulted in the lung abscesses. It is claimed that such a procedure was improper and not in conformity with the rules of the practices of the profession. Plaintiff called as a witness a qualified dentist, Kenneth R. McIntyre, who testified as follows in answer to hypothetical questions:

"Now Doctor, assuming that on or about July 10, 1948 Mrs. Wintersteen went to have 17 of her teeth extracted and that 12 of these teeth were upper teeth and five of them were lower teeth, and assuming that she had a pyorrheatic condition of the mouth and that her teeth had deposits of tarter around and between them, and that about eleven A. M. or so on that day she was administered a general anasthetic, and that about fifteen minutes or so thereafter her husband, Mr. Wintersteen, was taken into a room where Mrs. Wintersteen was lying and that he found Mrs. Wintersteen lying on a cot, that she was lying on her back with her head tilted to the right, that she was in a horizontal position, in other words, and that he observed her eyes and that her eyes were closed, and that he talked to her and that there was on [sic] response, and that he shook her and there was no response, and that he watched over her while she was lying in this horizontal position with her head tilted to the right for a matter of five or more minutes, after

which time she awoke. I will ask you, Doctor, under these circumstances whether or not you would say that the ordinary care, skill, and diligence used by the average, ordinary dentist under like circumstances in the locality had been used.

\* \* \*

"A. In my opinion the patient shouldn't have been in a horizontal position on her back.

Q. Doctor, state what under those circumstances, that is, with reference to her position, the ordinary skill, diligence, and care used by the average, ordinary dentist under like circumstances in this locality would have dictated.

"A. The patient is usually placed on the side so that everything can drain out of the mouth."

■ We are of the opinion that Doctor McIntyre's testimony would be substantial evidence tending to show that the placing of a patient on the back and not on the side would not be in accord with the proper treatment that is ordinarily employed by members of the dental profession of good standing in the same locality. The law requires of a dentist in treating a patient that he exercise that degree of care, skill, diligence and knowledge which is ordinarily possessed by the average of the members of the profession of good standing in similar localities. *Malila v. Meacham,* 187 Or 330, 335, 211 P2d 747; *Darling v. Semler,* 145 Or 259, 264, 27 P2d 886.

■ We have carefully searched the record and are unable to find any evidence from which the jury could find that the plaintiff was placed on her back when put on the cot. The only evidence touching on this question is that supplied by plaintiff's husband who testified that, after the nurse had come to the waiting room to invite him to the recovery room, he went into that room and found plaintiff on her back with her

head tilted to the right. Since proper practice would dictate that the patient should be placed on her side, the presumption would be that defendant did place plaintiff in that position when she was laid on the cot. This presumption was fortified by the testimony of Doctor Burton and Nurse Magner who testified that, although they had no recollection of the particulars of who placed plaintiff on the cot or of in what position she was placed, the ordinary practice which they followed was to place a patient on her side with an emissis basin under her mouth for drainage, and that a patient afterward often turned over onto her back in attempting to get into the most comfortable position, which is in harmony with the well-recognized fact that even a person in deep sleep will do this.

In passing, it is interesting to note that plaintiff's evidence discloses that, although she was lying horizontally on her back, her head was tipped to the right. In this connection, Doctor Tuhy, plaintiff's witness, testified as follows in answering questions propounded:

"Q. * * * After such an operation with the material coming out so fast, if she is unconscious the probabilities of it being aspirated are just as great in one position as another if she has her head on the right?

"A. I understood you to say—you asked me whether the probabilities are the same if she were lying on her side with her head tipped over as compared to lying on her back with her head tipped over. I would say there was less likelihood in lying on her side.

"Q. Yes, but you are getting into probabilities of conjecture there, isn't that right?

"A. No; from gravity the probabilities of secretion are much more likely with the head tipped over."

Since plaintiff's head was tipped to the right, it is difficult to understand, as a practical matter, what difference it would make what position her body was in since, in both instances, her head would be tipped over to the right, thus permitting drainage, or "secretion", as Doctor Tuhy termed it.

We are of the opinion that plaintiff has failed to sustain the allegations of negligence hereinbefore discussed.

Since this case is of unusual importance, we will assume, for the purpose of a discussion of proximate cause, that plaintiff's allegation of negligence in the foregoing respect was supported by substantial evidence which warranted the submission of the same to the jury. Proximate cause will then next become the pivotal question. In this connection plaintiff asserts that her being placed on her back following the extraction in the manner aforementioned was responsible for foreign matters draining down through her windpipe into her lungs, thus causing the abscesses in her right lung.

When Doctor Tuhy, plaintiff's witness, was asked the hypothetical question of whether or not he had an opinion that the lung abscesses were connected with or resulted from plaintiff's teeth extractions, he replied that he thought they were due to the aspiration of the infected material during or after the extraction when she was unconscious from the anesthesia, but that it was more probable that it had happened afterward while she was on the cot, if the dentist had used all the proper precautions during the extraction. When he was asked if he thought it was because of her being on her back on the cot following the extraction that the

abscesses were caused, he replied that the prone position under general anesthesia in tonsillectomies was one of the least desirable positions to be in since the infected material could drain down into the trachea, and also the coughing and expectorating so soon (two days) after the extractions under anesthesia caused him to think that she had aspirated infected material while on the cot. He also admitted on cross-examination that on account of her pyorrheatic condition it was possible that the infected material could have been aspirated during deep sleep, with or without an operation or the giving of an anesthetic, or that embolism might have occurred from the blood stream during the extractions, or without them, which could have caused the infection to travel via the heart into the lungs, or that it could have happened while she was being transferred to the recovery room after the extraction.

Throughout his testimony Doctor Tuhy insisted that the probabilities were that plaintiff aspirated the foreign material while reposing on her back following the extraction, and that the aspiration in the other particulars were mere possibilities. He concluded:

"Q. * * * in fact you are in accordance regarding these abscesses, Doctor, that you don't know the causes at all, you can't determine them at all. Isn't that right?

"A. That is true."

Before proceeding to analyze Doctor Tuhy's testimony, we call attention to the fact that there was no direct evidence that any foreign substance went down plaintiff's trachea into her lungs, or that such foreign material was infectious, or that such foreign matter infected plaintiff's lung to the extent of causing plaintiff's abscesses.

The purport of Doctor Tuhy's testimony in answer to hypothetical questions was that when he operated in October he found that plaintiff had an abscess in her lung, and that, since she was on her back in an unconscious condition for five minutes after her teeth were extracted, she having pyorrhea, infected material in all probability was aspirated through her windpipe into her lungs, and that such infected material caused the abscesses. As against this supposition or inference, we have his testimony that there could have been aspirations into her lungs while her teeth were being extracted, while she was being taken into the recovery room after the extraction, during the night while she was asleep, with or without teeth extraction, or through pyorrheatic infection getting into the blood stream and finally lodging in her lungs.

The legal question is whether or not, in view of the foregoing testimony of Doctor Tuhy, the proximate cause of the abscess was the placing of plaintiff on her back on the cot in an unconscious condition following the extraction of her teeth.

It is defendant's position that the plaintiff's entire case of proximate cause is predicated upon an inference on an inference, and that this violates § 2-402, OCLA, which, in part, reads as follows: "An inference is a deduction which the reason of the jury makes from the facts proved, * * *."

It is urged that the only established fact or the fact proved was that plaintiff had an abscess, and that to arrive at the conclusion that such abscess was caused by plaintiff's position on her back, the following inferences must be indulged in: (1) that foreign matter got into plaintiff's trachea; (2) that such matter proceeded into plaintiff's lungs; (3) that such matter was

infectious, and (4) that such infectious material caused the abscess.

In the case of *McKay v. State Ind. Acc. Com.*, 161 Or 191, 195, 198, 201, 87 P2d 202, may be found a full and complete discussion of an inference upon an inference, with citations of earlier Oregon cases. It was claimed that the decedent received an electric shock while using a telephone. He proceeded to his home in an automobile, and, after traveling about 28 miles, his car left the pavement, throwing McKay to the pavement and causing his death. It was the theory of the plaintiff that McKay's death was due to heart failure which was caused by the electric shock which he had received earlier that day. Two doctors testified that in their opinion ''heart fibrillation, induced by electric shock, was the probable cause of his death.'', which caused him to either die or collapse at the wheel, thus causing his loss of control of the automobile. Speaking through Mr. Justice Lusk, we said:

> ''But we are of the opinion that the evidence fails to establish that the cause of McKay's death was electric shock. On the contrary, the question is left wholly in a state of uncertainty.
>
> ''* * * * *
>
> ''The testimony of Dr. Erwin and Dr. Coe that McKay's death was due to an injury to his heart has only one possible basis, and that is the fact that the man died. Without that there is no evidence whatever from which such injury can be found, and the doctors did not claim that there is. All that could be definitely known about the decedent was that he had received an electric shock and that he died in an automobile accident a few hours later. But the cause of death was the question at issue, and in whatever form of language the experts might choose to clothe their opinions they necessarily arrived at

them by assuming as a fact the very thing that was in dispute. In other words, they reasoned that because McKay sustained an electric shock he came to his death, and because he died the electric shock must have produced an injury to his heart capable of causing death or a collapse. This is not reasoning from cause to effect; it is reasoning in a circle."

We further said that there is sometimes no accountability for automobiles leaving the highway. The drivers of automobiles sometimes fall asleep at the wheel, sometimes there are mechanical defects which cause accidents, and that,

"It could as well be said that, as between two possible causes of decedent's death, no evidence has been produced which makes one cause appear as more probable than the other, or enables the triers of the facts to do other than guess at the solution of the mystery. In that situation the plaintiff necessarily must fail." See *Annereau v. Ewauna Box Co.*, 176 Or 509, 159 P2d 215; *Parker v. Pettit*, 171 Or 481, 138 P2d 592; *Vale v. State Ind. Acc. Com.*, 160 Or 569, 86 P2d 956.

So, in the instant case the only known or proved fact is that plaintiff had an abscess, and, to arrive at the conclusion that such abscess was caused by the improper position of plaintiff on her back, Doctor Tuhy had to indulge in the several inferences hereinbefore set out. It is well known that a person may suffer an abscess from various causes, and to say that plaintiff's abscess was caused in the manner delineated by Doctor Tuhy would be pure conjecture and highly speculative.

In the case of *Spain v. Oregon-Washington R. & N. Co.*, 78 Or 355, 153 P 470, Ann Cas 1917E, 1104, speaking through Mr. Justice McBride, we said:

"* * * When the evidence leaves the case in such a situation that the jury will be required to

speculate and guess which of several possible causes occasioned the injury, that part of the case should be withdrawn from their consideration."

Plaintiff relies on *Clemens v. Smith*, 170 Or 400, 134 P2d 424. In that case defendant Smith, a physician and surgeon, was charged with malpractice while removing a cyst from the back of plaintiff's wrist by failing to use sterile instruments, to the end that plaintiff's wrist became infected. The evidence showed that the instruments used by Doctor Smith were unsterile, that no infection could come from the cyst in and of itself, and that the infection the plaintiff had came from the kind of germ that could come from unsterile instruments. The facts in the Clemens case are a far cry from the facts in the present case.

In citing the Clemens case plaintiff quoted from *Lippold v. Kidd*, 126 Or 160, 269 P 210, 59 ALR 875, as follows:

" ' "The law does not demand of a plaintiff that he establish with certainty the proximate cause of his injury. If the proof shows that a certain factor probably bore to injury the relationship of cause, the law is satisfied and denominates it the proximately [sic] cause." ' "

In the Lippold case there were four uncertainties as to the cause of the loss of an eye, and, in denying plaintiff recovery, at p. 170 we said:

"* * * And this court has on previous occasions ennunciated the rule that when an alleged injury may have been due to one of several causes, any one of which may have been the sole proximate cause, there can be no recovery unless it is shown that as between the two or more causes in question, it was the negligence of the defendant which caused the injury."

■ We will treat plainitff's second and third allegations of negligence together as they emanate from the same circumstances. They follow:

"Defendants failed, refused and neglected to secure any medical or dental or any other kind of post operative assistance or aid or counsel for plaintiff after being advised of her complaints, pains and symptoms as aforealleged.

"On or about July 19, 1948, plaintiff advised defendants that she was having repeated and violent coughing spells, that during said time she was discharging from her mouth a foul, greenish, bile-like substance, that she was unable to sleep at night because of said coughing spells and the discharging of said substance, that she was unable to keep food on her stomach except milk and anacin, and that symptoms, pain, and sufferings complained of as aforesaid were commonly associated with the after-effects of extractions."

In connection with the above, plaintiff testified that she told the nurse when she went back on July 19, 1948, to have her sutures removed that, " 'I don't know what is the matter with me; * * * I have been having violent coughing spells and coughing up this greenish bile-like substance and I felt as though I was losing weight.' " Upon being queried, "Did she respond to that?", plaintiff replied, "She [the nurse] said that was the natural thing after the extraction of teeth ........."

Since the evidence showed that it was the duty of the nurse to notify defendant of any complaints the patients might make, we will assume for the purpose of this discussion that defendant had knowledge of the complaints of plaintiff which she conveyed to the nurse. There was evidence by Doctor McIntyre that proper practice would dictate that defendant upon being apprised of plaintiff's condition should have referred her

"to a physician and have a checkup." The complaint did not allege that by reason of the failure of the defendant to advise her to go to a physician she refrained from taking such course, nor that had she seen a physician her condition would have been alleviated.

The rule of pleading in the above respect is laid down in *Horn v. National Hospital Association*, 169 Or 654, 670, 131 P2d 455, wherein, speaking through Mr. JUSTICE BRAND, we said:

"The alleged negligence is the failure to diagnose and advise plaintiff concerning her physical condition and particularly concerning her diseased gall bladder. It is to this failure therefore that the chain of proximate causation must be linked. Unlike cases in which affirmative injury is done in the very course of operating upon a patient, the mere failure here to diagnose and advise, in and of itself, caused no damage. Resulting damage could be made to appear only by showing other circumstances which rendered the failure harmful. The plaintiff, in recognition of this fact, was required to and did plead that the undiscovered chronic gall bladder condition was one 'for which immediate medical and surgical treatment was indicated.' The next step was to plead that the immediate treatment indicated as necessary would have been administered if the condition had been discovered. This, also, the plaintiff alleged in substance by pleading that, 'Plaintiff, being ignorant of the nature of said condition, did not *at that time* obtain any medical or surgical treatment for the same.' (Italics ours.) The last necessary element in the chain of causation is that the absence of medical or surgical treatment at the time resulted in damage which would not have occurred if the treatment had been administered. The plaintiff alleges that harm occurred as a result of the nondiscovery of the gall bladder condition, but that allegation can only be true if the nondiscovery resulted in the alleged nontreatment."

Since plaintiff's complaint was deficient as hereinbefore pointed out, plaintiff could not recover on said allegation of negligence.

■ In considering the third allegation that defendant was negligent by reason of the nurse's telling plaintiff that, "That was the natural thing after the extraction of teeth.", we find that there is no allegation in the complaint nor any evidence in the record that the symptoms alleged and testified to were not the ordinary and probable consequence of extractions, nor is there any evidence of express or apparent authority in the nurse to give such advice. Mrs. Schamel, the nurse in attendance, was a dental and not a registered nurse. The uncontradicted testimony of Doctor Semler was that when complaints were made by patients to the nurses after teeth extractions, it was their duty to report such complaints to the dentists and not give advice. In fact, Doctor McIntyre testified as follows: "My opinion is the nurse shouldn't give any advise [sic] at all. She has no qualifications to state those things."

The judgment of the lower court is reversed with instructions to enter judgment in favor of defendant.

### Petition for Rehearing

*Krause, Evans & Korn,* and *Elam Amstutz,* of Portland, for the petition.

*Easley, Whipple & McCormick; Phillips, Coughlin, Buell & Phillips;* and *Lloyd M. McCormick,* all of Portland, contra.

Before Brand[*], Chief Justice, and Rossman, Lusk, Latourette[**] and Tooze, Justices.

[*] Chief Justice when original decision was rendered.
[**] Chief Justice when this decision was rendered.

TOOZE, J.

Plaintiff petitions for a rehearing, presenting a number of assignments of error directed to our original opinion.

It is unnecessary for us to review in detail the evidence in the case, because practically all the essential facts are set forth in our former opinion. However, for the purposes of this opinion, we will hereinafter enlarge upon our statement of the evidence.

We have given careful consideration to the several assignments of error and to the briefs of the respective parties relating thereto. Although there is merit in some of the assignments, nevertheless, with one exception, they do not reach the heart of this case. We therefore refrain from discussing all the assignments, because, in our opinion, only one deserves serious consideration, and our decision thereon will be decisive of this matter.

Plaintiff alleges that this court erred "in holding that defendant's negligence in allowing plaintiff to assume a horizontal position on her back on the cot while unconscious was not a proximate cause of the putrid abscesses", and further, that "the court erred in holding that Dr. Tuhy's testimony as to proximate cause was pure conjecture and highly speculative for the reason that Dr. Tuhy testified that the putrid lung abscesses were probably caused by the aspiration of infected pyorrheatic material while reposing on her back *under anaesthesia* following the extractions, and that all other causes of her putrid abscesses, while possible, were improbable." (Italics ours.)

■■ It is elementary that to fix liability in a case of this nature two things must concur and combine: (1) an act of negligence on the part of defendant: and (2) such act of negligence must be a proximate cause of the injury. If either of these elements is missing, there can be no liability. To warrant a recovery of damages, each and both of these constituents of a cause of action must be established by a preponderance of evidence.

At the outset it may be conceded that there is substantial evidence in the record to establish an act of negligence on the part of defendant in permitting plaintiff to lie on her back in the recovery room immediately following the teeth extraction operation. This is the act of negligence upon which plaintiff relies and upon which her entire case rests.

The decisive question then remains: Is there substantial evidence in the record tending to establish the fact that this act of negligence was a proximate cause of the injury of which plaintiff complains?

■■ Ordinarily the question of whether a particular act was the proximate cause of the injury complained of is one for decision by the jury, and it is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of proximate cause becomes one of law for the court. When the existence of proximate cause under the facts is challenged, it is for the court to say whether there is substantial evidence in the record sufficient to submit the question to the jury. *Kukacka v. Rock,* 154 Or 542, 544, 61 P2d 297; *Miami Quarry Co. v. Seaborg Packing Co.,* 103 Or 362, 370, 204 P 492.

■ In determining the question whether there is substantial evidence in this case to support a finding that

defendant's act of negligence was the proximate cause of plaintiff's injury, we must view the testimony in the light most favorable to her.

To establish proximate cause, plaintiff relies entirely upon the testimony of Dr. John E. Tuhy, a duly licensed physician and surgeon of the city of Portland. She has caused a complete transcript of his testimony given on the trial to be attached to her brief on rehearing. It is manifest from the record that if Dr. Tuhy's testimony is insufficient as a matter of law to warrant the submission of the question of proximate cause to the jury, plaintiff's cause of action against defendant must fail.

In our former opinion when discussing the question of proximate cause, we quoted to some extent from the testimony of Dr. Tuhy. We concluded that it was insufficient to establish the element of proximate cause. We have carefully reexamined that conclusion and in doing so have given additional and painstaking attention to all his testimony. Although we must and do assume as true all facts to which Dr. Tuhy testified, we are not required to, nor do we, assume the correctness of any of his conclusions or opinions unless they are based upon substantial evidence in the record.

To clarify the problem before us, we propose to quote at length from Dr. Tuhy's testimony, setting out all of his testimony which, in our opinion, is material to the question of proximate cause.

Plaintiff suffered from an abscess of the upper lobe of the right lung. It was discovered when X-rays were taken in September and October, 1948. Dr. Tuhy operated upon her "in order to drain the abscess". Before the operation Dr. Tuhy examined plaintiff's windpipe and bronchial tubes "with a lighted instrument",

to determine "if there were any foreign materials such as tooth fragments and so on in the bronchial tube". No tooth fragment "or anything of the like" was found. In reply to a question whether plaintiff suffered any permanent disability as the result of the abscess, Dr. Tuhy said: "I think there will be a slight permanent disability. * * * She would tend to be short of breath, more than the average person, so I would say that there was some slight permanent disability."

Dr. Tuhy was then asked the following hypothetical question:

"Doctor, assuming that before July 10, 1948, Mrs. Wintersteen was in good health, and assuming that on or about July 10, 1948, she went to Dr. Semler's office to have her teeth extracted, and that she had 17 teeth at that time, that at that time there were tartar deposits on and around her teeth and that she had a pyorrheatic condition of the mouth, and further assuming that about eleven o'clock on July 10, 1948, all her 17 teeth were removed at one time, *she being under a general anesthetic,* and assuming that she was thereafter taken onto a cot in Dr. Semler's office, and that about 11:15 or so that morning her husband first saw her after she went in for her surgery, and that *he saw her lying on this cot in a horizontal position,* that is, on her back, with her head tilted to the right, and that *he observed that her eyes were shut and that she was motionless, and he tried talking to her without any response, and that he nudged her without any response,* and then he continued standing over her for a period of approximately five minutes or more, and then assume that on or about July 19, 1948, Mrs. Wintersteen returned to the office of Dr. Semler and advised a nurse there named Jane Schamel that she had been suffering since about July 13, 1948, from repeated and severe coughing spells and that she was bringing up a greenish bile-like substance and she felt that she was losing

weight because she wasn't able to take any food, and that the only food that she was able to take was milk, and that she was also taking anacin. Then, Doctor, assume that these same complaints continued thereafter, and then that she went to the St. Vincents Hospital, where those pictures were taken—those X-rays were taken—on September 2, 1948, that you have examined and testified about. Doctor, would you have an opinion as to whether or not the lung abscess that was shown on those X-rays of September 2, 1948 was connected or resulted from the extraction of Mrs. Wintersteen's teeth?'' (Italics ours.)

Defendant at this point objected upon the ground that the hypothetical question did not contain a statement of all the material facts, particularly the time element, and upon other grounds which we deem unnecessary to mention. After some discussion between court and counsel, plaintiff requested and received permission of the court to modify the question by stating the time element without reciting the question. Whereupon, the following question was directed to the witness:

"Doctor, assuming the same circumstances that I set out to you in that question, and further, that Mrs. Wintersteen *was administered a general anesthetic* about eleven A.M. on July 10, 1948, and that her husband found her in the position mentioned at about 11:15 A.M. on that same day, and that he then stood over her for a period of approximately five minutes or more and that she was in this same prone position, that is, a horizontal position on her back, with her head tilted to the right, during that whole time he was standing over her, *and further assume that the dentist who extracted the teeth used complete and proper dental procedures in connection with the blocking of the throat at the time the teeth were removed;* under those circumstances, Doctor, do you have an opinion as

to whether or not Mrs. Wintersteen's lung abscesses were caused by anything connected with the extractions?'' (Italics ours.)

To this question the Doctor replied:

''Yes, I believe that the lung abscesses were due to the aspiration of infected material from her pyorrhea, *either during or following* the extractions *when she was under the influence of general anesthesia.*'' (Italics ours.)

At this point we think it should be emphasized that in order to establish the necessary element of proximate cause in this case, the evidence must tend to show that the aspiration of infected material, if there was such aspiration, occurred during the short period of time plaintiff rested in the recovery room *following* the operation. If it occurred *during* the operation, then defendant's act of negligence hereinbefore noted could not possibly be the proximate cause of plaintiff's injury. We make note of the fact that the Doctor stated that it may have occurred not only *during* the operation, as well as following, but also that it was ''when she was under the influence of general anaesthesia.''

The following question was then directed to Dr. Tuhy:

''Doctor, assuming that when her teeth were taken out, that is, at the time the teeth actually were extracted, proper dental procedures were followed, so as to eliminate that possibility, then is it your opinion that by reason of the position she had on the couch these abscesses developed?''

An objection was made and sustained to this question, and then the following question was propounded:

''Doctor, would you care to pick out any incident in that hypothetical question that I mentioned to you to connect up the lung abscesses with the *extraction?*'' (Italics· ours.)

Dr. Tuhy replied:

"The prompt appearance following the extractions *under* general anesthesia of the symptoms of coughing and expectoration of this material [referring to a time one or two days following the extractions] certainly from experience would lead me to think that it was quite likely that she had aspirated this infected material. When a person is *under general anesthesia* and there is infected material draining from the mouth or sinuses after a *tonsillectomy* one of the worst positions that you may assume is a flat or horizontal one, because material will go down the mouth and between the vocal cords and into the windpipe. It won't do that in a person who is awake because *normal reflexes will make that person spit out the stuff* before it goes into the windpipe, but *where these reflexes are depressed by anesthesia* or insulin shock the infected material will lodge in the portion of the lung in the back." (Italics ours.)

The witness further testified as follows:

"Q  You first treated Mrs. Wintersteen at Matson Memorial in a surgical way for the abscess in the upper part of the right lung?

"A  That is correct.

"Q  Do you have an opinion, Doctor, as to what caused that abscess?

"A  I believe that it followed a suppurative pneumonia due to the aspiration of foreign material in the mouth incident to extractions."

Later in his direct examination Dr. Tuhy testified that plaintiff had a putrid lung abscess, which he described as one where the pus has a foul odor. He also expressed it as his opinion that following an operation involving the throat or mouth, a patient should be placed in a head-down position, because, as he said:

"Well, if a person has had an operation on the mouth or nose or throat *and is unconcious* and is

allowed simply to lie flat on his back or perhaps reclining with his head up, the secretions are much more apt to go down into the windpipe and into the lungs than if they are properly suctioned out and allowed to drain by gravity while he is *recovering from the anesthesia.*" (Italics ours.)

Thereupon, another hypothetical question was directed to the witness. The following are the proceedings in connection therewith:

"Q I would like to ask you this question Doctor: Assuming that before July, 1948, Mrs. Wintersteen was in good health and assuming that on or about July 10, 1948, she went to Dr. Semler's office to have her teeth extracted and that she had seventeen teeth at that time and that at that time there were tartar deposits on or around her teeth and that she had a pyorrhetic [sic] condition of her mouth, and further assuming that about eleven o'clock on that day all of her seventeen teeth were removed at one time and *under general anaesthesia,* and assuming further that thereafter and on that same day her husband found her in what is called a lay-out room lying on her back in a horizontal position with her mouth turned to the right, and that *her eyes were closed and that she was motionless and that he tried talking to her without response from her and that he shook her without response from her, and* assuming further that she had been given this general anaesthesia about eleven o'clock that morning and that her husband continued standing over her for a period of about five or more minutes after eleven-fifteen and that during this entire period she did not—she continued in the same state that I have mentioned, and that *after about five or more minutes she got up,* opened her eyes and then her husband assisted her in a sitting position and then, Doctor, assume that on or about July 19, 1948, Mrs. Wintersteen returned to the office of Dr. Semler and advised the nurse there whose name was Jane Schamel that she had been

suffering since about July 13, 1948, from repeated and severe coughing spells and that she was bringing up a greenish bile-like substance, and that she felt like she was losing weight because she wasn't able to take any food and that the only food that she was able to take was milk and that she was also taking aspirin; then assume, Doctor, that on or about September 2nd or September 1st she went to the St. Vincent's Hospital and then that those X-rays were taken on September 2nd which you have seen and observed and testifiefid [sic] about, *Doctor, under all those circumstances would you have an opinion as to the time that these lung abscesses were contracted?*

"MR. EASLEY: That has all been gone over. We have been over this already, your Honor. I think it is repititious [sic]. The doctor will probably admit that he answered the same identical question yesterday.

"THE COURT: The date of the contracting, I didn't recall was gone into. If it was—is that the object of your question?

"MR. KORN: Yes, your Honor.

"MR. EASLEY: The actual date?

"MR. KORN: Yes.

"MR. EASLEY: I understood that the doctor had limited it to the teeth extractions on the 10th, but then maybe I was wrong.

"Q (by Mr. Korn) Do you have an opinion on that, Doctor?

"A Yes.

"Q What is that opinion?

"A I would conclude that Mrs. Wintersteen a couple of days after these extractions had developed the symptoms of what we call a suppurative pneumonia which was a forerunner of the lung abscess and that, further, the suppurative pneumonia was in all probability caused by the aspiration of infected material from her mouth, *either during the procedure or immediately afterward,*

especially since her position during the period of recovery from anaesthesia would not be considered proper medically since in such a position and *under general anaesthesia* she would be more likely to aspirate such material when she was unconscious.

"Q Then do you have an opinion as to the probabilities *of the time* element as to the aspiration of those materials?

"A It could have occurred *either during the extractions or in the period of unconsciousness under general anaesthesia afterward, and I don't think that I could say when it was more likely to have occurred.*

"Q What are the probabilities, Doctor?

"A I would say that if the dentist who did the extractions had used all the usual precautions during the extensions [sic], suction of infected material, packing of the throat and so on, if he had used all those precautions and then she had been laid out in this horizontal position on her back, that *it was very likely that this infected material had gone down afterwards when she was on the couch.*

"Q And are those the probabilities to your knowledge, Doctor?

"A Yes." (Italics ours.)

It is noted that in the Doctor's reply to the question he again stated that "in all probability" the aspiration occurred either *during* the operation or immediately afterward, and while plaintiff was "under general anaesthesia" and "when she was unconscious." We also observe that in his answer to the second question relating to the time element, he repeated that the "probabilities" were it "could have occurred either *during the extraction*" or "in the period of *unconsciousness under general anaesthesia afterwards.*" (Italics ours.) His statement: "and I don't think I could say when it was more likely to have occurred", is significant.

His later assertion "that it was very likely that this infected material had gone down afterwards when she was on the couch", must be considered in the light of his prior answers which were in substance to the effect that it occurred, if it occurred at all, while plaintiff was "under general anaesthesia" and "when she was unconscious." Moreover, it is obvious that there is a decided inconsistency between his last statement and that made immediately prior thereto that, "I don't think that I could say when it was more likely to have occurred." Considering his prior replies and the foundation upon which they were based, is it not manifest that his opinion as to what was "very likely" or "probable" constituted but a mere guess on his part and is purely speculative?

An opinion of a medical expert that a result is "probable" or "very likely" presents no question for jury determination, unless it is based upon facts and, in the light of all the evidence in the case, is reasonably sustainable. In *McKay v. State Ind. Acc. Com.*, 161 Or 191, 87 P2d 202, Mr. Justice Lusk, in writing the opinion of the court, rejected the testimony of a medical expert who had testified that "heart failure" at a particular specified time was "probable". When such medical "opinion" is plainly opposed to reason, it fails to constitute substantial evidence for any purpose.

Upon cross-examination, Dr. Tuhy was examined as to the causes of lung abscesses. Several possibilities as to how plaintiff's lung abscess may have been caused by the pyorrhea, other than the manner claimed in this case, were developed, and admitted by the witness. Thereafter, he testified as follows:

"Q Now you have already told the jury and

the Court that the trachea is sort of a tree-like device, we call it the windpipe?

"A Yes, the windpipe is simply a tube that divides into the main bronchial tubes and into many other bronchial tubes.

"Q Nature has fixed the trachea so that the likelihood of outside matter getting in is limited?

"A That is correct.

"Q In other words, what is the device up there at the head of the trachea which protects the trachea, what is that called?

"A The epiglottis is sort of a trapdoor business where the vocal cords lead into the windpipe. The epiglottis helps tend to cover the progress of the cords so that foreign matter doesn't go into the windpipe but goes into the esophagus.

"Q In other words, nature had protected the lungs from the foreign objects?

"A Yes, in that way and in other ways, too.

"Q Now it is a fact, Doctor, in natural or induced sleep that particular reflex at the mouth of the trachea is the last to go away and the first to return, isn't that right, in the normal physical reflexes?

"A Yes, *the cough reflex is not lost in fairly deep anaesthesia,* in the third plane of anaesthesia, generally.

"Q So that this cough reflex—and that is what we are talking about—remains because nature has this coughing device to keep things out of your lungs, too, and that is it, isn't it?

"A No, there are others—of course, if material does get down into the windpipe there are nerve endings which stimulate coughing and tend to expel it. Then there are others—shall I go into them?

"Q No, because I am primarily interested in the ones at the head of the trachea.

"A Yes.

"Q So that reflex, in induced sleep or normal sleep if the reflex is going to go it will be the last

reflex to go because of the lung protection it affords?

"A Well, *I would say that the cough reflex is effective* in ordinary sleep but that it *is depressed or absent in anaesthesia, and especially in deep anaesthesia.*

"Q You wouldn't say that the cough reflex in sleep is as good as it is when you are awake?

"A I would say that it isn't as good in *deep sleep.* In ordinary light sleep if anything gets down in there, a person will cough, I would say, just as well as if he is awake; but in *profound sleep under the influence of alcohol or sedatives or narcotics, the reflex would definitely be depressed.*

"Q So it is all a matter of degree?

"A That is correct." (Italics ours.)

The theory of the doctor, as well as of plaintiff in this case, is that plaintiff's cough reflexes were depressed by the anaesthesia, so that they did not operate to prevent foreign material from entering the lung cavity by way of the windpipe. From the foregoing testimony of the witness, it is evident that the cough reflex is not ordinarily lost in light or *fairly deep* anaesthesia, but only in "deep anaesthesia" or "profound sleep under the influence of alcohol * * *."

In reference to anaesthesia and its effects, the witness testified:

"Q Doctor, you are talking about anaesthesia. This anaesthesia is proportioned to the job to be done?

"A That is correct.

"Q And the more anaesthesia given, the more the tendency is to become deeper in sleep; the more anaesthesia you give the more the reflexes disappear?

"A Yes, that is correct.

"Q Now, then, for a comparatively short operation of, say, ten or fifteen minutes, in fact, the

time differential or interval between the time that the person goes into the chair and the time that she is given oxygen and led into a room, a matter of less than an hour—in fact, you have been told about the facts of this case and you know that she went into the chair at a quarter to eleven, that is, she was led into the room at a quarter to eleven, she went down the hall to the bathroom, she came back, she took off her coat and earrings—you have heard all this.

"A  Yes.

"Q  Well, she was administered—she was prepared for the anaesthesia and she was administered the anaesthesia, seventeen teeth were extracted, she was then administered oxygen, which was normal, isn't that right, to bring them out of the sleep?

"A  It is commonly done, yes. ·

"Q  So they are artificially induced to sleep and artificially brought out of it?—[objection] * * * And then she stayed five or ten minutes, in other words, the anaesthesia time—the recovery time is approximately the anaesthesia time, and then she was helped out, walked down the stairs, took a cab and got into the 5100 block north of Burnside on Mallory Street by noon. In other words, an hour and fifteen minutes between the time that she went into the room and did all of this until the time she got clear out to the north end. *It would be your considered opinion that she was in very light anaesthesia?*

"A  Not necessarily.

"Q  Why?

"A  *It would depend on the anaesthetic agent. There are some anaesthesias that are quickly acting and quickly go away that may produce fairly deep anaesthesia.*

"Q  What about nitrous oxide?

"A  *Nitrous oxide, one may get fairly deep anaesthesia and recovery is fairly prompt.*

"Q With those facts in mind, wouldn't you say that the probabilities are that the anaesthesia wasn't deep?

"A Could you tell me about her status, the state of her pupillary reflexes, for example, and whether she did cough during the extractions and so on? I think I could answer better.

"Q There will be evidence that there was never any coughing.

"A There was never any coughing. Well, I would think *that would be a point in favor of the cough reflex being depressed.*

"Q Why is that?

"A Because lying in this horizontal position, it would be almost inevitable.

"Q *We are talking about sitting in the chair with the anaesthesia, nitrous oxide.*

"* * * * *

"THE WITNESS: If a person has had extractions a certain amount of blood will go down the back of the throat which they should, of course, spit up or have it suctioned out, usually both, and if they lie under anaesthesia on their back, I would say it is almost inevitable for some material to go down there. Now *if they are under very light anaesthesia, just almost awake, that will get them to coughing.* They will try to set up and cough, and cough and spit this stuff out. *If they are under fairly deep anaesthesia the material is apt to go down unobstructed.*" (Italics ours.)

The undisputed facts show that plaintiff was administered nitrous oxide; that before the operation was entirely completed, oxygen was used to restore her to consciousness, the amount of oxygen being regulated so that recovery was coincident with the end of the operation. When plaintiff had sufficiently recovered from the anaesthesia, the operation being com-

pleted, she got out of the dental chair and with the assistance of the nurse walked to the recovery room.

■ From the foregoing statement of the evidence, it is patent that plaintiff was not under "fairly deep" nor "deep" anaesthesia while in the recovery room. She had come out from under the anaesthesia before she left the dental chair; so much so, in fact, that she was able to walk, with assistance, to the recovery room. There is no substantial evidence in the record that she was "unconscious" at any time after the operation was completed. The testimony of her husband as to what was said and done in the recovery room falls far short of being substantial evidence to establish the essential fact that plaintiff was "unconscious" at that time, or even that she was sound asleep, and his testimony is the only testimony in the record which relates to the few moments plaintiff was lying on the cot. This testimony is summarized in the hypothetical questions, supra.

Our search of the record fails to disclose any medical testimony to the effect that one who has been administered nitrous oxide, recovery from which is *fairly prompt*, and who has been given oxygen to hasten consciousness (and who has recovered consciousness to the extent of being able to walk with assistance from the dental chair to the resting room), may again lapse into a state of unconsciousness from the effects of the drug theretofore used. Common sense teaches us that one who has been restored to consciousness after anaesthesia will, for a short time at least, remain drowsy and not wish to be disturbed. The fact that within a period of five minutes, more or less, after lying down, plaintiff was able to get up, walk through the dental offices to the elevator, and leave the build-

ing, the nurse having done nothing in the meantime to hasten wakefulness, also is significant.

The most that can be claimed for the testimony of plaintiff's husband is that it affords the basis for a speculative inference, another doubtful link in the chain of causation; a "speculative inference", because from this testimony alone, considered in the light of the entire record, it is manifest that the jury would necessarily be compelled to resort to mere guess to find that plaintiff was "unconscious under general anaesthesia", with her cough reflexes depressed, at the time in question. To eliminate all the other possibilities mentioned in our former opinion as to time and cause, and as an essential step in pinpointing "aspiration of infected material" during the brief time plaintiff was in the recovery room, it is necessary to depend entirely upon Mr. Wintersteen's testimony.

Plaintiff's case upon proximate cause must first pass the test of whether there is substantial evidence to show "unconsciousness under general anaesthesia" on her part while she was resting immediately following the operation. "Unconsciousness under general anaesthesia" is the sole basis for Dr. Tuhy's inference that aspiration likely occurred while plaintiff was so lying down. We again repeat his answer to the hypothetical question: "It could have occurred *either* during the extractions or in the period of *unconsciousness under general anaesthesia afterward* * * *." (Italics ours.) It is obvious from the record that Dr. Tuhy's deduction was based upon an erroneous premise, a premise which finds no substantial support in the evidence. As we point out in our former opinion and as further demonstrated herein, Dr. Tuhy's opinion was purely speculative.

15. In 15 Am Jur 413, Damages, § 22, the following rules are stated:

"The damages recovered in any case must be shown with *reasonable certainty* both as to their nature and *in respect of the cause from which they proceed.* No recovery can be had where it is uncertain whether plaintiff suffered any damages *unless it is established with reasonable certainty* that the damages sought resulted from the act complained of. Hence, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from some other cause, or where it is impossible to say what, if any, portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself." (Italics ours.)

Also see *Becker v. Tillamook Bay Lbr. Co. et al.,* 194 Or 134, 142, 240 P2d 237; *Allen et ux. v. McCormick,* 193 Or 604, 612, 238 P2d 220; *Spain v. Oregon-Washington R. & N. Co.,* 78 Or 355, 369, 153 P 470, Ann Cas 1917E, 1104.

■ The conclusion we reached in our former opinion that plaintiff had failed, as a matter of law, to establish the element of proximate cause is correct, and we adhere to the result therein announced.

The petition for rehearing is denied.